Zachary WILSON

v.

Jeffrey BEARD, Commissioner, Pennsylvania Department of Corrections; David Diguglielmo, Superintendent of the State Correctional Institution at Graterford; Frank Tennis, Acting Superintendent of the State Correctional Institution at Rockview, Appellants.

No. 06–9004.

United States Court of Appeals, Third Circuit.

Argued on March 20, 2009.

Opinion Filed: Dec. 23, 2009.

Lynne Abraham, Esquire, District Attorney, David Curtis Glebe, Esquire (Argued) Assistant District Attorney, Thomas W. Dolgenos, Esquire, Chief, Federal Litigation, Ronald Eisenberg, Esquire, Deputy, Law Division, Arnold H. Gordon, Esquire, First Assistant District Attorney, Philadelphia, PA, for Appellants.

Maureen Kearney Rowley, Esquire, Chief Federal Defender, Michael Wiseman, Esquire (Argued), David Wycoff, Esquire, Billy H. Nolas, Esquire, Assistant Federal Defenders, Federal Community Defender Office for the Eastern District of Pennsylvania, Federal Capital Habeas

Corpus Unit, Philadelphia, PA, for Appellee.

Before: McKEE, CHAGARES and ROTH, Circuit Judges.

## OPINION

ROTH, Circuit Judge:

In 1988, Zachary Wilson was convicted of the 1981 murder of Jamie Lamb, who was shot in a bar in the City of Philadelphia. Wilson was sentenced to death. During his post-conviction relief proceedings, he learned that the Commonwealth had withheld certain information from his counsel during trial that could have been used for impeachment purposes. He asserts that the Commonwealth thereby violated his right to due process as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After relief was denied by the Pennsylvania Supreme Court, Wilson filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania, raising thirteen claims for relief. The District Court held a hearing solely on his *Brady* claim and, concluding that a violation of *Brady* had occurred, granted Wilson's request for habeas relief, vacated his conviction, and allowed the Commonwealth 180 days in which to retry him. For the reasons set forth below, we will affirm the judgment of the District Court.

## I. *Factual Background and Procedural History*

The factual background is taken from the opinions of the Pennsylvania Supreme Court and the District Court. *See Commonwealth v. Wilson,* 538 Pa. 485, 649 A.2d 435 (1994) (direct appeal proceedings)(*Wilson I*); *Commonwealth v. Wilson,* 580 Pa. 439, 861 A.2d 919 (2004) (appeal of post-conviction relief proceed-

ings)(*Wilson II*); and *Wilson v. Beard,* Civ. No. 05–2667, 2006 WL 2346277 (E.D.Pa. Aug. 9, 2006) (federal habeas corpus proceedings)(*Wilson III*). The relevant facts are not in dispute.

On August 3, 1981, a man entered a bar in the City of Philadelphia and "pulled a gun from under his coat as he walked past several patrons sitting at the bar. He aimed the gun at the victim, Lamb, who was sitting at the rear of the bar. After shooting the victim four times, [the man] fled the scene. The victim subsequently died from injuries caused by multiple gunshot wounds." *Wilson I,* 649 A.2d at 440. The shooter was later identified by two eyewitnesses, Jeffrey Rahming and Edward Jackson, as Wilson.

According to the Pennsylvania Supreme Court:

A Commonwealth witness, Jeffrey Rahming, was in the rear of the bar, standing just behind the victim when the shooting started. Rahming saw Appellant enter the bar, aim the gun at the victim, and shoot the gun.

A second Commonwealth witness, Edward Jackson, was sitting at the front of the bar when Appellant entered. He, as well as many other patrons, dove to the floor as the gunfire began. When Appellant rushed to leave the bar, he tripped over Jackson and fell to the floor. Jackson and Appellant came face to face before Appellant scrambled to his feet and ran out of the bar.

*Id.*

Both Jackson and Rahming described the gunman to police and attended a police lineup in March 1982. At the lineup, Rahming identified Wilson as the gunman but Jackson did not. Wilson was charged with Lamb's murder, but the charges were dismissed when Rahming failed to identify Wilson at the initial preliminary hearing.

Wilson was later incarcerated on unrelated charges. In the summer of 1984, Lawrence Gainer told Philadelphia Police Officer John Fleming that in October 1983, when he and Wilson were incarcerated together, he asked Wilson why he killed Lamb and Wilson responded that he killed Lamb "because Lamb had killed [his] adopted brother, Ronnie Williams." Gainer refused to cooperate further at that time. However, Gainer again spoke to Officer Fleming in March 1986, at which time he agreed to provide a statement to the detectives investigating the homicide. Based on Gainer's statement, Wilson was re-arrested and charged a second time with Lamb's murder.

On January 5, 1988, Wilson's trial began in the Philadelphia Court of Common Pleas before Judge Alfred F. Sabo. The Commonwealth's case was based almost entirely on the testimony of Jackson, Rahming, and Gainer. The jury returned its verdict on January 7, 1988, finding Wilson guilty of first degree murder and possession of an instrument of crime. The court held a penalty hearing on January 11, 1988. The jury found two aggravating circumstances—a significant history of violent felony convictions and the knowing creation of a grave risk of death to others—and no mitigating circumstances, and returned a sentence of death. On January 25, 1988, Judge Sabo sentenced Wilson to death and a term of imprisonment of 2.5 to 5 years.

The Pennsylvania Supreme Court affirmed Wilson's conviction and sentence, and the United States Supreme Court denied certiorari. *See Wilson v. Pennsylvania,* 516 U.S. 850, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995). Through counsel, Wilson then filed a petition pursuant to the Post Conviction Relief Act (PCRA). *See* 42 Pa. Cons.Stat. Ann. § 9541 *et seq.* In his PCRA petition, Wilson alleged that the prosecution withheld evidence demonstrating that Officer Fleming coerced and threatened Gainer and Rahming into falsely incriminating Wilson and that Detective Keenan exerted undue and improper influence over Jackson in order to obtain his false testimony against Wilson. The scope and nature of Wilson's *Brady* claim changed during the course of the PCRA proceedings, as Wilson learned that Jackson had an undisclosed prior criminal conviction for impersonating a police officer, that both Jackson and Rahming had prior mental health diagnoses relevant to their abilities to accurately experience and recall events, and that Officer Fleming had made interest-free loans to Gainer during the time that Gainer acted as a police informant. At the instruction of the PCRA court, Wilson filed a "Post–PCRA Hearing Memorandum" in which he set out all of these bases for his *Brady* claim.

On May 6, 1998, the PCRA court denied Wilson's PCRA petition, issuing a written opinion on September 23, 1999, in which it did not address Wilson's *Brady* claim at all. The Pennsylvania Supreme Court affirmed the denial of PCRA relief on November 19, 2004, holding that Wilson had waived his *Brady* claim by failing to include it in his original PCRA petition or to seek leave to amend his petition to include such a claim. Accordingly, the Pennsylvania Supreme Court declined to address this claim on merits.

On June 6, 2005, Wilson filed the underlying petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition contained thirteen claims for relief, only one of which is at issue in the instant appeal. In Claim I, Wilson asserts that the prosecution violated his right to due process as set out in *Brady* by failing to turn over evidence to defense counsel that could have been used to impeach Jackson, Rahming, and Gainer and to undercut the

prosecution's case against him. After extensive briefing and oral argument on this issue, the District Court agreed and granted relief, vacating Wilson's conviction and allowing the Commonwealth 180 days to retry him.

## II. Jurisdiction

■ The District Court had jurisdiction over this case under 28 U.S.C. §§ 2241 and 2254. We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. The Commonwealth is not required to obtain a certificate of appealability in order to appeal the District Court's decision to grant Wilson's petition for a writ of habeas corpus. *See Cristin v. Brennan,* 281 F.3d 404, 409 (3d Cir.2002) (citing Fed. R.App. P. 22(b)(3)).

## III. Standard of Review

■ Because the facts underlying the *Brady* issue are not in dispute, our review

of the District Court's decision on that issue is plenary.[1] *See Duncan v. Morton,* 256 F.3d 189, 196 (3d Cir. 2001). Wilson's petition for a writ of habeas corpus was filed after April 1996 and is therefore subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2241 *et seq.* Under AEDPA,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the

---

1. The District Court entered partial summary judgment in favor of Wilson pursuant to Federal Rule of Civil Procedure 56. We have previously recognized the propriety of the entry of summary judgment in the habeas context, *see Carter v. Rafferty,* 826 F.2d 1299, 1304 (3d Cir.1987), as have several of our sister circuits. *See, e.g., Davis v. Woodford,* 384 F.3d 628, 637–38 (9th Cir.2004); *Hunt v. Lee,* 291 F.3d 284, 288 (4th Cir.2002); *Caldwell v. Bell,* 288 F.3d 838, 841 (6th Cir.2002). The parties agree that the facts underlying Wilson's *Brady* claim are not in dispute. Their materiality is a legal question for us to decide. *See Carter,* 826 F.2d at 1304 (holding that "materiality of evidence under *Brady* is a mixed question of law and fact" such that the ultimate state court conclusion on materiality is not entitled to AEDPA deference); *see also United States v. Oruche,* 484 F.3d 590, 595 (D.C.Cir.2007) ("Once the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law"); *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir.1995) (internal citations omitted) (explaining that "[w]hile the trial judge's factual conclusions as to the effect of nondisclo-

sure are ordinarily 'entitled to great weight,' we conduct our own ' "independent examination" ' of the record in determining whether the suppressed evidence is material"). A court considering a grant of summary judgment must draw all 2001. Wilson's petition for a writ of habeas corpus was filed after April 1996 and is therefore subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2241 *et seq.* Under AEDPA, reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Carter,* 826 F.2d at 1304. As we explain below, in this case, the only reasonable inference we can draw from the undisputed facts is that, given the information suppressed by the Commonwealth, any competent trial counsel would have conducted the type of investigation outlined by Wilson and would have used the information developed therefrom to impeach the three witnesses on whose testimony the Commonwealth built its case. Accordingly, we agree with the District Court that the entry of summary judgment in favor of petitioner was appropriate in this case.

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1). Because the Pennsylvania Supreme Court held that Wilson's *Brady* claim was waived, it did not reach the merits of the claim. Accordingly, there was no state-level adjudication on the merits to which the District Court had to defer. *See id.; see also Bronshtein v. Horn*, 404 F.3d 700, 710 n. 4 (3d Cir. 2005). The District Court therefore reviewed this claim *de novo. See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001). Because we agree with the District Court that Wilson's *Brady* claim is not procedurally barred, we will do the same. *See id.* at 211–12.

## IV. *Discussion*

### A. Procedural default

■ A federal court may not review "a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A state procedural rule is not an adequate bar unless it is " 'firmly established and regularly followed.' " *Bronshtein*, 404 F.3d at 707 (quoting *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984))). Whether such a rule is "firmly established and regularly followed" is determined as of the date the default oc-

curred. *See Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir.2007).

■ The Commonwealth argues that Wilson's *Brady* claim is procedurally defaulted, based on the Pennsylvania Supreme Court's holding that Wilson waived it by failing to raise it in its current form in his initial PCRA petition, *see* Pa. R.Crim. P. 902(B), or to seek leave to amend his PCRA petition to include this claim. *See* Pa. R.Crim. P. 905(A) & (D). At the time Wilson filed his PCRA petition and, in fact, at the time it was denied, the Pennsylvania Supreme Court still employed the "relaxed waiver" doctrine to reach the merits of claims brought by capital defendants which might otherwise be barred by waiver. *See Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174, 180–81 (1978). It was not until November 1998 that the Pennsylvania Supreme Court discontinued this practice. *See Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 700 (1998). As we have held on numerous occasions, in capital cases where the waiver occurred before the Pennsylvania Supreme Court made it clear that it would no longer apply the relaxed waiver rule, the waiver rule was not "firmly established and regularly followed" and, therefore, the waiver is not an adequate basis for a finding of procedural default.[2] *See, e.g., Albrecht*, 485 F.3d at 116; *Laird v. Horn*, 414 F.3d 419, 425 & n. 7 (3d Cir. 2005); *Jacobs v. Horn*, 395 F.3d 92, 117–18 (3d Cir.2005); *Szuchon v. Lehman*, 273 F.3d 299, 326–27 (3d Cir.2001). The Commonwealth's arguments to the contrary

---

**2.** In *Bronshtein*, we noted that our opinion in *Fahy v. Horn*, 240 F.3d 239 (3d Cir.2001), implied that the waiver rule adopted in *Albrecht* may not have become firmly established until the Pennsylvania Supreme Court's decision in *Commonwealth v. Banks*, 556 Pa. 1, 726 A.2d 374 (1999). *See Bronshtein*, 404 F.3d at 709 (citing *Fahy*, 240 F.3d at 245). However, we further observed in *Bronshtein*,

as we do now, that it was unnecessary for us to decide exactly when the waiver rule became sufficiently firmly established to be considered an adequate bar to a procedural default, since the alleged waiver in this case occurred prior to the state supreme court's decision in *Albrecht. Bronshtein*, 404 F.3d at 709; *see also Holland v. Horn*, 519 F.3d 107, 116 n. 5 (3d Cir.2008).

notwithstanding, we agree with Wilson and the District Court that the waiver rule as applied in this case was not adequate and, accordingly, that Wilson's *Brady* claim is not procedurally defaulted.

## B. Brady Claim

■■■■ In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. Subsequent cases have construed *Brady* to require the disclosure by the prosecution not only of information actually known to the prosecutor, but of all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam); *Kyles v. Whitley*, 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Under well-established Supreme Court precedent, we will examine three factors in determining if a *Brady* violation has occurred: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). The purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would ensure him a fair trial. *See United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Ultimately, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

■■■■ As the Supreme Court has emphasized, the impact of the suppressed evidence must be considered cumulatively, not individually. *See id.* at 436, 115 S.Ct. 1555. The Supreme Court has described this as a balancing test for the prosecution:

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.

*Id.* at 437, 115 S.Ct. 1555.

■■■■ While the *Brady* decision itself concerned the failure of the prosecutor to disclose exculpatory evidence, it is clear that the rule announced in *Brady* applies with equal force to the prosecutor's failure to disclose evidence which could have been used for impeachment purposes. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The rationale for this is clear: "Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375 (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194).

Wilson claims that the Commonwealth withheld three key pieces of information

which could have been used to impeach the Commonwealth's primary witnesses against him at trial and which, if disclosed, clearly would have led to the discovery of additional information that also could have been used for impeachment purposes: (1) Jackson's prior *crimen falsi* conviction for impersonating a police officer; (2) Rahming's history of mental health problems and psychiatric interventions, including but not limited to the fact that he was taken to the Emergency Health Services Center at Hahnemann Hospital by a detective from the prosecutor's office the day after he testified at Wilson's trial; and (3) Officer Fleming's history of providing Gainer with interest-free loans of undisclosed amounts during the time that Gainer acted as a police informant.

On May 26, 1981, six weeks before the shooting, Jackson was arrested for impersonating a police officer. According to the man he assaulted, who was employed as a security guard by the Southeastern Pennsylvania Transportation Authority, Jackson took his gun, threw him up against a wall, and told him he was going to arrest him. Jackson was wearing a blue uniform and a badge and informed the victim that he was part of a special unit of the Philadelphia Police Department. Jackson was convicted on October 28, 1981, and a pre-sentence investigation and mental health evaluation were ordered. At the PCRA hearing, Wilson's trial counsel, Joel Trigiani, testified that, had he seen Jackson's rap sheet, he would have requested to see the pre-sentence investigation report and mental health evaluation and would have used the information contained therein to impeach Jackson.

The pre-sentence investigation report, dated December 16, 1981, reveals six out-of-state arrests, two involving impersonation of a police officer. Additionally, it states that Jackson had sustained a severe head injury in 1970 and that "within the past one and one half years, he has experienced pains in the back of his head, blackouts, and occasional loss of memory." The mental health evaluation, dated October 28, 1981, states:

> He received two fractured skulls. The first time was in 1974 and the second time was in '79. He states that he has been having bad headaches and blackouts of late. Testing indicates that there may be some difficulty in the left hemisphere. He has some motor visual problems, cannot subtract sevens backwards. He has difficulty counting backwards from 20 . . . .

With respect to his mental status, the report notes that Jackson's "long and short term memory were weak, but his social judgment was adequate. He could not think in abstract terms, and he has difficulty explaining himself and was easily confused." According to the report, the psychological testing revealed:

> patterns that have a neurological quality in that he was blocked and unable to form adequate perceptions, and showed some dissociative tendencies. He has a need to have control over his environment primarily because he has difficulty interacting within a normal manner. He has a severe status problem and has a need to be accepted.

The report further states:

> He sees himself as being an aid to the Police and likes to associate and attach himself to Police activities. His poor judgment and distorted perceptions of reality and where he fits into it appropriately causes him to function beyond normal limits at times.

With respect to the Commonwealth's second eyewitness, Rahming, Wilson alleges that the Commonwealth had in its possession at the time of trial, but withheld, information regarding Rahming's history

of mental health problems and psychiatric interventions. On January 6, 1988, the second day of Wilson's trial and the day after Rahming testified that he had witnessed Lamb's murder, one of the detectives in the prosecutor's office took Rahming to Hahnemann Hospital's Emergency Health Services Center. The clinician's notes from that visit indicate that Rahming had a history of mental illness and had been treated with "Prolexin shots and pills as recently as 1 months ago. He reports that he has not abused any drugs since 1984. He has used marihuana at that time. Patient states that he recently witnessed a murder and the victim had fallen on him with the 'bullets in him.'" Rahming was diagnosed with schizophrenia at that time and discharged to a Community Mental Health Center for case management.

At the PCRA hearing, Trigiani testified that, had he been aware of Rahming's emergency room visit, he would have asked to see his rap sheet. His rap sheet indicates a court-ordered psychiatric evaluation dated February 25, 1980, and a pre-sentence investigation report dated March 31, 1980, and also reveals that Rahming was placed on "strict psychiatric probation" as a result of his April 9, 1980, sentence. The pre-sentence investigation report indicates a history of drug and alcohol abuse and notes that Rahming "appear[ed] to have a number of physical, social, and mental disorders." The mental health evaluation, which was conducted approximately sixteen months before the shooting, reveals that Rahming suffered from seizures and was on seizure medication at that time, and that he had been hit in the head with a padlock a few years earlier. With respect to his mental status, the report states:

> ... At times, he is rather sleepy-eyed, and closes his eyes momentarily, and tells me that he feels sleepy because of his seizure medication ...

...

He is well oriented and his memory is intact. His fund of information is rather limited, and his usual approach to problems is concrete although he does understand some abstractness. He appears in the low average intelligence, but his social judgment is rather impulsive and chaotic with poor capacity to turn to authority in an effective way. He does not express any clear-cut dys-social values however.

... He also tells me that he tends to lose his memory and does not always recall what he says or does if he becomes enraged, and he is expressing a pattern of epileptoid and disassociative acting out of his anger with a diminished sense of consciousness and responsibility and poor controls. He had little insight concerning this and he is not seen as a good candidate for psychotherapy because his thinking is rather concrete and limited.

The diagnosis section reads:

There is no evidence of any psychosis or major mental illness with this individual. He may be best described as a Mixed Personality Disorder with passive-aggressive and explosive traits who also suffers from a seizure disorder. Psychological test material indicates some primitive and morbid aspects with inadequate coping mechanisms and much unresolved tension and emotionality within this individual.

Periodic progress reports filed during his term of probation indicate that he was taking Haldol throughout 1980 and 1981. Trigiani testified that it would have been significant to know that Rahming was taking Haldol during the relevant time period because "Haldol is a psychotropic drug which is used to control psychoses or schizophrenia and it's a mood equalizer."

He also testified that it would have been helpful to know if Rahming had taken Haldol on the day of the shooting, because it may have affected his memory if he had or rendered him psychotic if he had not. The progress reports also describe Rahming as exhibiting the demeanor of a "slightly retarded person." During the PCRA hearing, Rahming admitted that he suffered, both then and at the time of the shooting, from schizophrenia, visual and auditory hallucinations, and "nervous breakdowns," that he was a heavy user of drugs and alcohol, that he regularly mixed street drugs, alcohol and prescription medications, and that he was intoxicated at the time of the shooting. Trigiani testified that if he had been in possession of that information during the trial, he "would have asked questions concerning his ability to perceive, which is just cross-examination. If the drugs affected him and he had symptoms affecting his ability to recall incidents, obviously it would have been an issue to be discussed before a jury." Trigiani also testified that Rahming's testimony during the PCRA hearing that he was taken to the emergency room by a detective from the District Attorney's Office for "placement" suggests that some arrangements had been made in advance of his testimony at Wilson's trial and that there was possibly some sort of "understanding" or "agreement in exchange for his testimony."

Finally, Officer Fleming's testimony at the PCRA hearing revealed that he had loaned money, interest-free, to Gainer during the time period when Gainer acted as a police informant. This is in contrast to his trial testimony, in which Officer Fleming testified that he and Gainer had been friends for thirteen years and that Officer Fleming had "used him on many occasions for information" but that he had not "paid Lawrence Gainer on prior occasions for his

information" and that he had "never given him anything."

There can be no dispute that all of this information would have been favorable to Wilson and could have been used to impeach the Commonwealth's three primary witnesses at trial and to undercut the Commonwealth's case against Wilson. Our analysis therefore focuses on whether this information was suppressed by the Commonwealth and whether it was material to the jury's verdict.

■■■ The Commonwealth vigorously disputes that the prosecution "suppressed" the information regarding Jackson's prior conviction. Trigiani testified at the PCRA hearing that he filed pre-trial motions asking the Commonwealth to provide all exculpatory and impeachment information, including *crimen falsi* convictions for Commonwealth witnesses. The Commonwealth failed to disclose Jackson's criminal background, and Wilson argues that it appears that, at the close of trial, the prosecutor affirmatively stated that Jackson had none:

> The Court: ... You have the convictions for Jeffrey, Jeffrey Rahming?
>
> Ms. Fisk: R–A–H–M–I–N–G.
>
> Robbery in '80, theft in '83, and an open case on retail theft.
>
> Mr. Trigiani: Right.
>
> Ms. Fisk: Correct?
>
> Mr. Trigiani: Gainer had—
>
> Ms. Fisk: Theft from '79 in New Jersey.
>
> The Court: Lawrence Gainer had—
>
> Ms. Fisk: 1979 theft.
>
> The Court: Theft in New Jersey.
>
> Ms. Fisk: That was all, no other convictions in *crimen falsi* beyond that.

Based on these representations, Trigiani testified that he "didn't believe that [Jackson] had any *crimen falsi* information."

The Commonwealth maintains that this was not an affirmative misrepresentation regarding Jackson's criminal record but, rather, an accurate reference to Gainer's criminal record. Accordingly, it argues that because the prosecutor did not affirmatively mislead defense counsel, because she was not personally aware that the information regarding Jackson's criminal history was in her file, and because that information was publicly available, there was no "suppression" within the meaning of *Brady*.

The Commonwealth misapprehends the state of the law as it relates to the prosecution's disclosure requirements. The record reflects that Jackson's 75–10 rap sheet was in the prosecutor's file and his conviction was known to the police. We have clearly held that the prosecution bears the burden of disclosing to the defense a prosecution witness's criminal record, whether or not an explicit request has been made by defense counsel. *See United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir.1991); *Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir.1998). The Commonwealth argues extensively that because Jackson's conviction was a matter of public record that easily could have been retrieved by defense counsel through the exercise of due diligence, the prosecution cannot be deemed to have "suppressed" the information. In making this assertion, the Commonwealth seeks to distinguish the instant case from *Perdomo*, in which we concluded that a *Brady* violation had occurred when the prosecutor failed to provide defense counsel with information regarding the prior criminal history of the prosecution's main witness. *See* 929 F.2d at 968. In response to two written requests for information regarding the criminal background of any prosecution witnesses, the prosecution responded that its main witness, Hector Soto, did not have a criminal background. After trial, it became evident that he did. *See id.* at

968–69. In response to the prosecution's argument that it was not obliged to furnish the public defender with this information because the public defender's office had previously represented Soto in connection with his criminal conviction and, accordingly, defense counsel could be imputed with knowledge of Soto's criminal background, we held:

> It is true that *Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence. Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence. Notwithstanding this particular branch of the *Brady* doctrine, the facts of the instant case do not even remotely suggest that defense counsel had any knowledge or, more importantly, any responsibility to be aware of the witness' criminal record. It is untenable to suggest that, in order to obtain impeachment evidence on behalf of a client, a public defender is, in any way, obligated to check the total list of persons who have been served by the agency to ascertain whether a prospective witness was a former client.... Moreover, the prosecution, not the defense, is equipped with the resources to accurately and comprehensively verify a witness' criminal background.

*Id.* at 973 (citations omitted).

 According to the Commonwealth, our decision in *Perdomo* was guided by an assessment of the imbalance of resources between the prosecution's office and the public defender's office, which is not present in this case. We disagree. As the District Court observes in its opinion, "[i]f the prosecution has the obligation, pursuant to *Perdomo*, to notify defense counsel

that a government witness has a criminal record even when that witness was represented by someone in defense counsel's office, the fact that a criminal record is a public document cannot absolve the prosecutor of her responsibility to provide that record to defense counsel." *Wilson III,* 2006 WL 2346277, at * 14. If anything, the argument for disclosure in the instant case is stronger because it is clear that the prosecutor had the information regarding Jackson's criminal history in her file, she failed to disclose this information when asked by the court during a charging conference for the witnesses' criminal histories, and the Commonwealth does not assert that Jackson was represented in his prior criminal proceeding by an attorney from defense counsel's office.

 As for the information regarding the remaining two witnesses, the Commonwealth does not and, in fact, cannot, seriously dispute that the prosecution "suppressed" the information regarding Rahming being taken to the emergency room, following his testimony, and Officer Fleming's extension of interest-free loans to Gainer. Whether it was a detective from the prosecutor's office or a police detective who took Rahming to the hospital, it is clear that "the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession." *United States v. Risha,* 445 F.3d 298, 303 (3d Cir.2006); *see also Kyles,* 514 U.S. at 437–38, 115 S.Ct. 1555; *Perdomo,* 929 F.2d at 970. Because Fleming was a member of the prosecution team, any *Brady* information known to him and not disclosed to the defense is imputed to the Commonwealth. *See Perdomo,* 929 F.2d at 970 (asserting that "the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it"); *cf. United States v. Pelullo,* 399 F.3d 197, 216 (3d Cir.2005)

(agreeing with *Perdomo* but noting that a prosecutor's office has no duty to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue).

Additionally, the record clearly reflects sufficient information regarding the relationship between Officer Fleming and Gainer to have imposed an affirmative obligation on the Commonwealth to satisfy itself that no money had changed hands between the two. *See Kyles,* 514 U.S. at 437, 115 S.Ct. 1555 (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). The Commonwealth did not decide to proceed with the charges against Wilson until Gainer came forward as a witness. In light of the crucial link provided by Gainer's testimony in this case, we believe that the prosecutor had an obligation to the Commonwealth, the court, and the defense to determine, to her own satisfaction, that Officer Fleming had fully disclosed all relevant information regarding his relationship with Gainer, and that she failed to do so.

 Finally, the Commonwealth challenges as speculative the assertion that defense counsel would have uncovered Jackson's 1981 pre-sentence investigation report and mental health evaluation and Rahming's history of mental illness had the prosecutor disclosed Jackson's prior conviction and Rahming's post-testimony visit to the emergency room. We disagree with the Commonwealth's characterization. The question under *Brady* is whether "disclosure of the suppressed evidence to *competent* counsel would have made a different result reasonably probable." *See Kyles,* 514 U.S. at 441, 115 S.Ct. 1555 (emphasis added); *see also East v. Johnson,* 123 F.3d 235, 236–40 & n. 1 (5th Cir.1997) (finding that a *Brady* violation occurred where the

prosecution failed to disclose the criminal record of a witness, the production of which would have led defense counsel to discover the witness's mental health history which could then have been used to impeach her testimony); *Banks v. Reynolds,* 54 F.3d 1508, 1519 (10th Cir.1995) (recognizing "that evidence in the hands of a competent defense attorney may be used 'to uncover other leads and defense theories' " and endorsing the "draw[ing] of reasonable inferences as to what those other lines of defense may have been"). We have no trouble concluding that *competent* trial counsel would have requested the pre-sentence investigation report and mental health evaluation prepared in connection with Jackson's conviction for impersonation of a public servant and that, had *competent* trial counsel been made aware of Rahming's post-testimony hospital visit, he would have sought out additional information regarding Rahming's mental health history. We also have no doubt that, as Trigiani testified at the PCRA hearing, *competent* trial counsel, having done so, would have used all of this information to impeach the Commonwealth's witnesses.

▇▇▇▇ The crux of the debate in this case is whether the suppressed evidence was "material." See *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different. *See Giglio,* 405 U.S. at 154, 92 S.Ct. 763. Again, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,*

514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375); *see also Strickler,* 527 U.S. at 289, 119 S.Ct. 1936 (1999) (petitioner must demonstrate " 'a reasonable probability' that the result of the trial would have been different if the suppressed [information] had been disclosed to the defense.").

▇▇▇▇ We agree with Wilson that Jackson's record of convictions is material because he would have been able to impeach Jackson's testimony with evidence of his *crimen falsi* convictions, pro-prosecution bias, and mental impairments, all of which undermine his reliability. Jackson's conviction for impersonating a police officer is a *crimen falsi, see Commonwealth v. Gallagher,* 341 Pa.Super. 152, 491 A.2d 196, 200 (Pa.Super.Ct.1985), and, thus, admissible impeachment evidence. *See id.; see also Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326, 1328–29 (1987). As noted earlier, it is clear that impeachment evidence falls within the scope of *Brady. See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375; *Giglio,* 405 U.S. at 154, 92 S.Ct. 763. As a result, we have had occasion to hold that the prosecution's failure to disclose *crimen falsi* convictions violates its duties under *Brady. See Hollman,* 158 F.3d at 180; *Perdomo,* 929 F.2d at 973.

With access to this information at trial, Wilson also could have argued that Jackson identified with and was biased in favor of law enforcement. Such an argument would have been supported by Jackson's conviction for his impersonation of a police officer and his mental health evaluation, which revealed that he had an "ingrained" psychological need to impersonate a police officer, to "be[ ] an aid to the Police" and "to associate and attach himself to Police activities," and that his mental problems caused him to "go overboard" trying to help the police, with "poor judgment and distorted perceptions of reality." *See*

*Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 853 (1989) (holding that evidence of character witness's enmity toward police was admissible to demonstrate "an attitude that could cause her to shade her testimony to benefit the appellant").

The mental health evaluation also indicates that Jackson had a history of "headaches and blackouts" and an inability "to form adequate perceptions," that he is "easily confused," has "dissociative tendencies," "blackouts," "motor visual problems," "weak" "long and short term memory," "poor judgment," and "distorted perceptions of reality." As Wilson explains, "[w]hen PCRA counsel confronted Jackson with this information at the hearing, Jackson admitted he had serious head injuries (skull fractures) in 1974 and 1979; since then, he has had problems with his memory and is easily confused; he suffered from these problems at the time of the shooting and trial; and he had a drug and alcohol problem and was drinking at the time of the shooting." This evidence could have been used to demonstrate Jackson's impaired "ability to perceive, remember and narrate perceptions accurately," which is clearly relevant to his credibility as a witness. *See Cohen v. Albert Einstein Med. Ctr.,* 405 Pa.Super. 392, 592 A.2d 720, 726 (1991) ("Evidence of mental illness or a disability which impairs a witness's ability to perceive, remember and narrate perceptions accurately is invariably admissible to impeach credibility...."). In light of the circumstances surrounding the shooting—that Jackson had never seen the shooter before, he observed the shooter for just a "split second" in poor lighting, he identified someone other than Wilson as the shooter in the lineup, he told police he "didn't really remember what the guy looked like," and he first identified Wilson in court six and one-half years after the shooting—this evidence of Jackson's men-

tal health and drug and alcohol use clearly would have been valuable to defense counsel in cross-examining Jackson.

▮▮▮▮▮ Based on the circumstances of the shooting, the darkness in the bar, the brief time period in which the shooting occurred, and Rahming's inability to describe the shooter's clothing and failure to identify Wilson at the preliminary hearing, Wilson argues that the impeachment value of the evidence of Rahming's visit to the emergency room and his history of severe mental illness also would have been strong impeachment evidence. While the Commonwealth questions whether this evidence would have been admissible, it clearly meets Pennsylvania's standard for admissible impeachment evidence: that there be some connection between the proffered information and the witness's ability "to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime." *Cohen,* 592 A.2d at 726; *see also Commonwealth v. Butler,* 232 Pa.Super. 283, 331 A.2d 678, 680 (1974).

▮▮▮▮ While it may be true, as the Commonwealth suggests, that some of the notations in Rahming's hospital records would have bolstered his credibility as a witness, rather than damaging it, "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles,* 514 U.S. at 453, 115 S.Ct. 1555. In light of Rahming's long history of mental health problems, we cannot say that this information would have had no effect on the jury's assessment of Rahming's credibility.

▮▮▮▮ Finally, with respect to the information regarding Officer Fleming's provi-

sion of interest-free loans during the time Gainer acted as a police informant, Wilson maintains that this evidence could have been used both to impeach Gainer and to attack the good faith of the investigation. Gainer's first conversation with Wilson allegedly took place in 1983. He reported Wilson's remark to Officer Fleming but refused to cooperate any further at that time. In 1986, after a subsequent conversation with Officer Fleming, Gainer agreed to cooperate. While the Commonwealth correctly argues that trial counsel did attempt to impeach Gainer during the trial by exploring the nature and extent of his relationship with Officer Fleming, we disagree with its assertion that this "one additional fact" would not have affected the jury's assessment of Gainer's credibility.

During trial, when Joel Trigani, Wilson's counsel, tried to elicit evidence that Gainer was a paid informant for Officer Fleming, his questioning was objected to by the Commonwealth as "irrelevant." Judge Sabo then removed the jury from the courtroom and allowed counsel to question Fleming *in camera*. At that time, Fleming testified under oath that he had "never given [Gainer] anything." We consider it significant both that Gainer agreed to come forward so many years after his initial conversation with Wilson and that the prosecution did not decide to reinstate the charges against Wilson until that time, despite the availability of two eyewitnesses whose testimony it has strenuously endorsed as reliable. In light of the apparent importance of Gainer's testimony to the Commonwealth's case against Wilson, we believe that any additional connection between Gainer and Officer Fleming would have been significant in terms of impeachment value, especially in light of Officer Fleming's emphatic testimony that he had "never given [Gainer] anything."

Overall, as the Pennsylvania Supreme Court observed and as a review of the trial transcript bears out, Wilson's conviction was based almost entirely on the testimony of these three witnesses. *See Wilson I*, 649 A.2d at 441; *Wilson II*, 861 A.2d at 922. Although the shooting occurred in a relatively crowded bar, no other eyewitnesses testified and the Commonwealth presented no physical evidence implicating Wilson as the shooter. In light of the importance of the testimony of these three witnesses and the significant impeachment value of the undisclosed information, we conclude that Wilson's right to due process, as set forth in *Brady*, was violated by the Commonwealth's failure to disclose this information.

## V. *Conclusion*

For the reasons stated above, we will affirm the judgment of the District Court.