**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-9002 & 18-9003

_____

ROBERT GENE REGA,
                            Appellant in No. 18-9002

v.

SECRETARY, PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; SUPERINTENDENT OF THE STATE
CORRECTIONAL INSTITUTION AT GREENE;
SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW,
                            Appellant in No. 18-9003

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-13-cv-01781)
District Judge: Honorable Joy Flowers Conti
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
August 21, 2024
_____

Before: KRAUSE, MCKEE, and SMITH, *Circuit Judges*

(Filed: August 23, 2024)

Hunter S. Labovitz
Office of Federal Public Defender
Capital Habeas Unit
Suite 707
215 Dean A. McGee Avenue
Old Post Office Bldg.
Oklahoma City, OK 73102

Sonali Shahi
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106

    *Counsel for Appellant in No. 18-9002*

Jeffrey D. Burkett
Jefferson County Office of District Attorney
200 Main Street
Brookville, PA 15825

    *Counsel for Appellant in No. 18-9003*

_____

OPINION OF THE COURT
_____

2

KRAUSE, *Circuit Judge*.

Robert Gene Rega was convicted of first-degree murder and sentenced to death in Pennsylvania state court. On habeas review, the District Court denied his guilt-phase claims but granted one of his penalty-phase claims and ordered the Commonwealth of Pennsylvania to either provide him with a new sentencing hearing or resentence him to life imprisonment.[1]

On appeal, Rega raises two claims that his prosecutor withheld evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and one claim that his prosecutor presented false testimony at trial and failed to correct it, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). We will affirm the denial of relief on these claims because the evidence and testimony in question were not material to Rega's murder conviction.

## I.     Factual and Procedural Background

In 2001, the Commonwealth charged Rega with first-degree murder and other crimes for shooting a security guard, Christopher Lauth, during a robbery at the Gateway Lodge in Jefferson County, Pennsylvania. In brief, Rega went to the

---

[1] We use "the Commonwealth" to refer collectively to the Secretary of the Pennsylvania Department of Corrections, the Superintendent of the State Correctional Institution at Greene, and the Superintendent of the State Correctional Institution at Rockview.

lodge with Shawn Bair, Raymond Fishel, and Stanford (Stan) Jones in order to rob its safe and ATM. Stan Jones's wife, Susan Jones, stayed at Rega's mobile home to watch his children. During the robbery, Lauth was shot and killed.

The Commonwealth tried Rega for murder on the theory that he was the shooter and mastermind of the robbery. To that end, the Commonwealth called three witnesses who identified Rega as the shooter—Bair, Fishel, and Susan Jones. Bair testified that, while he sat in the car with Stan Jones and Fishel after the robbery, he heard gunshots inside the lodge, after which Rega left the lodge, got in the car, and said, "I think I killed him." J.A. 491. Fishel also testified that Rega killed the victim and that when Rega returned to the car, he asked whether he "did the right thing." J.A. 563. Susan Jones was not at the lodge, but she testified that she later asked Rega why he killed the victim and that Rega told her "he had to do what he had to do" because "someone's name was mentioned." J.A. 405. On direct examination, the witnesses each acknowledged that they faced their own criminal charges arising from the incident but maintained that the prosecutor had not made any "promises" about how those charges would be resolved. J.A. 421, 465, 550.

Rega himself called Stan Jones, who also identified Rega as the shooter. Other evidence included a video recording of Rega purchasing ammunition for the gun used to kill Lauth and the testimony of Rega's friend, Michael Sharp, that Rega asked him to give police a false alibi for the night in question. Nevertheless, the only direct evidence that Rega shot

4

the victim was the testimony of Bair, Fishel, and Stan and Susan Jones.

Unsurprisingly, Rega's defense focused on attacking these witnesses' credibility. During examination and argument, Counsel sought to show that their testimony was inconsistent with prior statements to the police and that their own criminal charges provided them a motive to testify. For example, although Bair denied that the prosecutor had made any "promises" to him, he admitted that he still hoped the prosecutor would treat him favorably in exchange for his testimony. J.A. 501–02. Counsel reminded the jury of that testimony during closing argument and asserted that Bair was testifying to "save [his] own skin." J.A. 669. Counsel also noted Bair's admission that he was guilty of felony murder, suggested that Bair had a deal for felony murder to avoid the death penalty, and argued that "it is clear Mr. Bair had an interest in telling the story that he did." J.A. 670.

And as to all four witnesses, Counsel argued:

Now, each [witness], I submit to you, has an interest in the outcome of the case. What I mean by that is, each one wants to please the Commonwealth with the testimony that they have offered today. When the time comes these defendants are obviously thinking I want the Commonwealth to give me a favorable plea agreement or treat me in an otherwise favorable way. The witnesses were obviously thinking two

5

things; I can please the Commonwealth by offering this testimony, but I can also implicate and put the blame for these events on Robert Rega. They have an obvious interest in this case, and to suggest otherwise I suggest to you is absurd.

J.A. 658. In further support of that argument, Counsel previewed for the jury the "polluted source" instruction that the trial court went on to give. Both Counsel and the court advised the jury that all four of the shooter-identification witnesses were accomplices who faced their own charges, that "an accomplice when caught will often try to place the blame falsely on someone else" and "may testify falsely in the hope of obtaining favorable treatment," and that the jury should view their testimony "with disfavor" for that reason. J.A. 659–60 (closing argument); D. Ct. ECF No. 35 at 232–33 (jury instructions).

The jury nonetheless found Rega guilty of first-degree murder and voted to sentence him to death. Rega unsuccessfully challenged his conviction and sentence on direct appeal and in a proceeding under Pennsylvania's Post-Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. § 9501 *et seq.*, in which he raised the claims at issue here.

Rega then filed a federal habeas petition. The District Court denied Rega's guilt-phase claims but granted relief from his death sentence. Rega appealed, and we granted a certificate

6

of appealability (COA) on two issues.[2] First, we agreed to review Rega's claim that his prosecutor violated *Brady* by "failing to disclose (1) that Shawn Bair, Raymond Fishel, Susan Jones and Michael Sharp sought lenient treatment in exchange for their testimony against appellant and that the prosecutor told them that he would or 'probably' would consider their cooperation when considering possible pleas, and (2) evidence that Susan Jones suffered from memory problems." J.A. 1–2. Second, we elected to consider the claim that Rega's prosecutor violated *Giglio* and *Napue* by "failing to correct . . . the testimony of Bair, Fishel and Susan Jones that the prosecutor had not made any 'promises' to them." J.A. 2.[3] Each claim requires Rega to show, among other things, that the alleged violation was material to his conviction. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 285 (3d Cir. 2016) (en banc) (*Brady*); *Haskell v. Superintendent Greene SCI*, 866 F.3d

[2] The Commonwealth simultaneously appealed the order granting Rega relief from his death sentence, but it now asserts that it will not pursue the issue. Thus, the Commonwealth has waived any challenge to that order, *see In re Imerys Talc Am., Inc.*, 38 F.4th 361, 373 n.6 (3d Cir. 2022); *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 n.1 (10th Cir. 2016), and we will affirm it without further discussion.

[3] In that same order, we also granted a COA on two additional *Giglio/Napue* claims related to the witnesses' incentives to testify, as well as on Rega's claim that the alleged errors under *Brady* and *Giglio/Napue* "cumulatively prejudiced him." J.A. 2. But Rega now asserts that he is not pursuing his claim of cumulative prejudice, and he has not briefed his second and third *Giglio/Napue* claims. Thus, we address only his two *Brady* claims and his first *Giglio/Napue* claim.

139, 146–47 (3d Cir. 2017) (*Giglio*/*Napue*). We will affirm the denial of all claims on the ground that Rega has not made that showing.

## II.     <u>Jurisdiction and Standard of Review</u>

The District Court had jurisdiction under 28 U.S.C. § 2254, and we have jurisdiction under 28 U.S.C. § 1291 and § 2253. Our review of the District Court's decision is plenary because the District Court did not hold an evidentiary hearing and instead based its decision on the state court record. *See Haskell*, 866 F.3d at 145. Because this case comes to us on habeas review, we defer to the state court's rulings for claims adjudicated on the merits unless they were (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). *See Rogers v. Superintendent Greene SCI*, 80 F.4th 458, 462 (3d Cir. 2023).

## III.    <u>Discussion</u>

### A.     *Brady* **Claims**

The Supreme Court's decision in *Brady v. Maryland* requires prosecutors to affirmatively disclose evidence that is favorable to a defendant to his counsel. 373 U.S. at 87. But not every failure to disclose warrants relief. We will grant a new trial only if a petitioner demonstrates that (1) the withheld

8

evidence was favorable to him, either because it was "exculpatory" or "impeaching," (2) the State suppressed the evidence, either "willfully" or "inadvertently," and (3) the evidence was material "such that prejudice resulted from its suppression." *Dennis*, 834 F.3d at 284–85 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Materiality under *Brady* requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In other words, evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. And when reviewing *Brady* claims, we assess materiality cumulatively, rather than item-by-item. *See Dennis*, 834 F.3d at 312 (explaining that "[t]he importance of cumulative prejudice cannot be overstated, as it stems from the inherent power held by the prosecution, which motivated *Brady*").

### 1. *Statements to Witnesses About Leniency*

Rega claims that the prosecutor violated *Brady* by failing to disclose a statement the prosecutor made to witnesses when they asked about leniency in their own criminal cases. According to Rega, the prosecutor told them that, while he would not discuss any specific deals, he would or probably

would consider their testimony when considering pleas after Rega's trial was over.

At the outset, the parties disagree over the witnesses to whom the prosecutor made this statement. Rega argues that the prosecutor made it to Bair, Fishel, Susan Jones, and Sharp. The Commonwealth argues that Rega has shown only that the prosecutor made it to Bair. Having reviewed the issue, we agree with the Commonwealth. Bair's counsel testified at the PCRA hearing that the prosecutor refused to make any promises but told Bair that his assistance "probably . . . would be taken into account" in any future plea deal. J.A. 1248. But the evidence that Rega proffers as to Sharp is at best inconclusive; while Sharp's counsel testified to a general "understanding" with the prosecutor that Sharp's cooperation would be considered in a future plea agreement, he later clarified that he did not remember an "outright conversation" with the district attorney concerning the issue. J.A. 1440, 1444. And Rega has adduced no evidence that the prosecutor made a similar statement to Fishel or Susan Jones.[4] Thus, Rega has shown only that the prosecutor made this statement to Bair.

---

[4] The only other PCRA witness who testified that the prosecutor made a similar statement was counsel for Stan Jones (as distinct from Susan Jones), who was not a Commonwealth witness and as to whom Rega does not assert this claim. Rega argues that there was other PCRA testimony on this point, but he mischaracterizes the record. For example, Rega argues that Officer Louis Davis testified that the prosecutor made similar statements to Fishel and Susan Jones, but the passage he cites

On PCRA review, the Pennsylvania Supreme Court rejected this *Brady* claim on the ground that the prosecutor's statement to Bair was not favorable to Rega; according to that court, the alleged "promise" was nothing more than "the possibility for later negotiation based on the witness['s] cooperation" and therefore would not serve to impeach Bair's testimony. *Commonwealth v. Rega*, 70 A.3d 777, 781 (Pa. 2013). This determination appears reasonable. But even were it not, the prosecutor's statement clearly was not material.[5] *See Dennis*, 834 F.3d at 285. Bair was one of *four* participating witnesses who knew Rega and who unequivocally testified that he was the shooter. Rega does not argue that Bair's testimony was more important than the others', and our review does not suggest that it was. Nor do we see any other basis to conclude that further impeachment of Bair might have made a difference

is the prosecutor's characterization of Davis's testimony as to Stan Jones, not Fishel or Susan Jones.

Rega's legal arguments fare no better. Although he contends that the Pennsylvania Supreme Court found that the prosecutor made this statement to all four witnesses, the nature of that court's ruling did not require it to make any finding on this point, and it did not. Rega also argues that the Commonwealth judicially admitted this point in various filings, but none of the statements he cites constitutes an unequivocal or unambiguous concession that the prosecutor made any such statement to Fishel or Susan Jones. *See Bedrosian v. United States*, 42 F.4th 174, 184 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 2636 (2023).
[5] We review materiality de novo and not under 28 U.S.C. § 2254(d)(1) because, as described above, the Pennsylvania Supreme Court rejected the *Brady* claim on other grounds.

11

under the circumstances presented here.  *Cf. Haskell*, 866 F.3d at 146–47 (holding that promises of favorable treatment to one of four eyewitnesses was material under *Napue* and *Giglio* where one of the witnesses recanted the identification at trial and the other two previously denied that they could identify the shooter); *Slutzker v. Johnson*, 393 F.3d 373, 387–88 (3d Cir. 2004) (holding that evidence was material where four eyewitnesses identified the defendant, but one of them was more "credible" than the others, and the *Brady* evidence was that she previously told police that the defendant was not the perpetrator).

In any event, impeaching Bair with the prosecutor's statement would not have significantly undermined even Bair's own testimony.  Rega does not claim that the prosecutor offered Bair a specific incentive in exchange for his testimony, but rather that the prosecutor made the wholly noncommittal statement that he would *consider* Bair's testimony—or, in the precise words of Bair's counsel, "[j]ust probably it would be taken into account or at the end we will see how it all shakes out and we will take and deal with that at that point."  J.A. 1248.  This statement shows that Bair had a general motive to testify in the hope of receiving leniency on his own charges, but the jury already knew that.  The jury heard Bair testify that he was hoping for favorable treatment in exchange for his testimony, and Rega's counsel vigorously argued that point at closing.  Given Bair's testimony, that impeachment argument had evidentiary support and thus was not merely a "speculative and baseless line of attack," as Rega argues.  Opening Br. 41 (quoting *Davis v. Alaska*, 415 U.S. 308, 309 (1974)).  Both

12

Counsel and the court then drove home that point with the "polluted source" instruction. Adding the prosecutor's noncommittal statement to Bair would have added little, if anything, to the mix. *See Bell v. Bell*, 512 F.3d 223, 237 (6th Cir. 2008) (en banc) (holding that evidence of a witness's expectation of favorable treatment was not material where it merely would have bolstered an attack on credibility already made at closing); *McCleskey v. Kemp*, 753 F.2d 877, 884 (11th Cir. 1985) (en banc) (holding that a detective's offer to "speak a word" for the witness was not material under *Giglio* where, among other things, the witness already "admitted that he was testifying to protect himself"), *aff'd on other grounds*, 481 U.S. 279 (1987).

Finally, other trial evidence tied Rega to the murder weapon, thereby corroborating Bair's testimony. For example, Bair's testimony that Rega bought the ammunition for the gun used to kill Lauth is corroborated by the testimony of a Wal-Mart employee and the store's surveillance video recording. This evidence did not directly implicate Rega as the shooter, but it did give the jury additional reason to believe the consistent testimony of all four witnesses. Under these circumstances, introducing the prosecutor's noncommittal statement to Bair would not have "put the whole case in such a

different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

### 2. *Susan Jones's Memory Problems*

We reach the same conclusion even considering Rega's first *Brady* claim along with his second.[6] Rega contends that his prosecutor failed to disclose evidence that Susan Jones suffered from memory problems, namely, a letter from Susan Jones to the prosecutor in which she asserted that "I have a problem with my head," J.A. 2836, and a conversation she had with a police officer about her memory problems. In support of his claim, Rega also cites Susan Jones's PCRA testimony that police had to "jiggle [her] memory," J.A. 1846, and the PCRA testimony of Dr. Jonathan Mack that Susan Jones has a "brain impairment" called "pseudotumour cerebri" that can cause "memory loss," J.A. 2403–04, 2408–09.

Clearly, evidence of a government witness's memory problems could provide fodder for impeachment and is thus favorable to a defendant. *See United States v. Kohring*, 637 F.3d 895, 907 (9th Cir. 2011); *Conley v. United States*, 415 F.3d 183, 190 (1st Cir. 2005). However, the Pennsylvania Supreme Court ultimately concluded that this evidence was not material, and we agree. In the first place, and as with Bair,

___

[6] We assess cumulative materiality de novo because the Pennsylvania Supreme Court rejected Rega's first *Brady* claim for lack of favorability, and thus had no occasion to consider the two claims' cumulative materiality. *See Simmons v. Beard*, 590 F.3d 223, 233 (3d Cir. 2009).

14

Rega has not shown that this evidence would have undermined even Susan Jones's own testimony. Her most important testimony for present purposes was that Rega told her he killed the victim. But Rega has not argued, let alone shown, that this conversation was one of the subjects on which police "jiggled" her memory. Nor has he shown whether or how her condition might have interfered with her "ability to perceive, remember and narrate" either that specific conversation or the relevant events in general. *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (citation omitted). Susan Jones's testimony was specific and detailed, and it comported with a written statement she submitted to the police in 2001. We think it unlikely that a generalized showing of "memory problems" would have undermined that evidence.

Regardless, Susan Jones was not at the scene, and the three witnesses who were present at the lodge testified that Rega was the shooter. Further impeaching her would thus not have undermined the most damning evidence against Rega. Nor, as explained above, would further impeachment of Bair have undermined his own testimony. Such impeachment also would have left undisturbed the testimony of Fishel and Stan Jones that Rega was the shooter, which both independently implicated Rega and corroborated Bair's and Susan Jones's testimony on that point. Further impeachment of Susan Jones and Bair also would not have undermined other evidence of Rega's orchestration of and participation in the crime, including evidence tying him to the murder weapon. Thus,

15

even considered cumulatively, Rega's *Brady* evidence does not "undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

### B.   *Giglio*/*Napue* Claim

Rega's final claim is that Bair, Fishel, and Susan Jones falsely testified that the prosecutor did not make any "promises" to them and that the prosecutor, in violation of *Giglio* and *Napue*, knowingly presented and failed to correct that testimony.  J.A. 421, 465, 550.  Rega argues that this testimony was false because the prosecutor made a "promise" by uttering the statement underlying the first *Brady* claim— i.e., that he would or probably would consider the witnesses' testimony when offering plea deals in their own cases.  But as we explained in the context of his first *Brady* claim, Rega has shown only that the prosecutor made that statement to Bair. And with no showing that the prosecutor made that statement to Fishel or Susan Jones, Rega has provided no basis to conclude that their testimony on this point was false.  Thus, we limit our consideration of this claim to Bair, and we will affirm the denial of this claim because Bair's disavowal of any "promises" was not material.[7]

---

[7] As described above, Rega expressly declined to pursue his claim that we should assess the materiality of this *Giglio*/*Napue* claim cumulatively with his *Brady* claims.  Thus, we have no occasion to opine on whether *Brady* and *Giglio*/*Napue* claims should be considered cumulatively as a general matter, though we note that other Courts of Appeals have addressed that issue, *see, e.g.*, *Juniper v. Davis*, 74 F.4th

16

To establish a constitutional violation under *Giglio* and *Napue*, Rega must show that (1) Bair perjured himself, (2) the Government "knew or should have known of his perjury," (3) Bair's testimony "went uncorrected," and (4) there exists "any reasonable likelihood that the false testimony could have affected the verdict." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). This "reasonable likelihood" standard is "lower, more favorable to the defendant[] and hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." *Haskell*, 866 F.3d at 150 (quoting *United States v. Clay*, 720 F.3d 1021, 1026 (8th Cir. 2013)). It is "equivalent to the harmless-error standard articulated in *Chapman v. California*," under which a constitutional violation is harmless only if it is "harmless beyond a reasonable doubt." *Id.* at 147 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

The Pennsylvania Supreme Court determined that Bair did not perjure himself when he denied being made any promises because, as described above, Rega offered no evidence that the prosecutor made anything other than a vague statement to Bair that his cooperation might be considered in

---

196, 212–13 (4th Cir. 2023), and that the Supreme Court granted certiorari to consider it in *Glossip v. Oklahoma*, 144 S. Ct. 691 (2024) (mem.). In noting this issue, we do not suggest that our decision might be different if we considered all three claims cumulatively.

17

future plea negotiations. We defer to this reasonable determination under 28 U.S.C. § 2254(d)(1).

Even if we determined that Bair's testimony was "false" for purposes of *Giglio* and *Napue*, we would still deny Rega's claim as immaterial to the jury's verdict.[8] We reach that conclusion largely for the same reasons as above. Bair was merely one of four witnesses who identified Rega as the shooter, the jury already knew that Bair hoped for lenient treatment in exchange for testifying against Rega, the prosecutor's noncommittal statement that he would "consider" Bair's testimony added little to that line of impeachment, and the evidence overall (including evidence corroborating other aspects of Bair's testimony) showed that Rega was the mastermind and tied him to the murder weapon. Rega's counsel used his direct examination of Bair and closing argument to emphasize Bair's potentially selfish motives, and the trial court warned the jury about those motives in its "polluted source" instructions. Thus, no "reasonable likelihood" exists that the challenged testimony affected the

---

[8] As with Rega's first *Brady* claim, we review materiality de novo and not under 28 U.S.C. § 2254(d)(1) because the Pennsylvania Supreme Court did not reach the issue. *See Dennis*, 834 F.3d at 283–84.

18

jury's judgment. *Haskell*, 866 F.3d at 152; *see McCleskey*, 753 F.2d at 884.

## IV.   Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.