FISHER, Circuit Judge,
dissenting,
with whom SMITH, CHAGARES and HARDIMAN, Circuit Judges, join.
A Philadelphia jury convicted James Dennis of murder and sentenced him to death. The Pennsylvania Supreme Court affirmed his conviction and sentence. His petition for postconviction relief was denied, and, after several intervening decisions, this denial was affirmed by the Pennsylvania Supreme Court. The Majority overturns these state-court decisions by concluding that the prosecution failed to disclose to Dennis exculpatory material in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Majority is particularly concerned about the reliability of eyewitness testimony and about a “shodd[y]” investigation by the Philadelphia police. Maj. Op. 307. By taking this approach, the Majority goes off course for two reasons. First, the evidence against Dennis was strong — it is hard to discount the identification testimony of three eyewitnesses. Second, and more importantly, the Majority fails to adhere to the narrowly circumscribed scope of habe-as review. Congress has decreed that we may not grant a writ of habeas corpus unless the judgment of the state court was clearly unreasonable, not merely incorrect. Applying this standard of review to a case such as this one is difficult, but the Supreme Court has repeatedly reversed those courts of appeals that have not faithfully followed this mandate. The Pennsylvania Supreme Court did not unreasonably apply clearly established federal law, and for that reason I dissent.
I
On a sunny fall afternoon in 1991, Che-dell Williams and her friend Zahra Howard got off the bus that had brought them from their high school and climbed the steps of the Fern Rock SEPTA station in Philadelphia. Two men accosted them and demanded their earrings. Williams ran into the street to escape. One of the men chased her, grabbed her, and ripped her earrings out of her ears. He raised a silver revolver and fired one shot into her neck from less than an inch away. Williams collapsed and died. The shooter fled. Three eyewitnesses, including Howard, observed the shooter at close range. They each identified the shooter in a photo array, in a lineup, and at trial: the shooter was James Dennis.
The Majority discusses in detail the testimony of the three eyewitnesses who testified at trial that Dennis shot Williams: Zahra Howard, Thomas Bertha, and James Cameron. The Majority calls out discrepancies between the eyewitnesses’ descriptions of the shooter’s height and weight (said to be 5'9" or 5'10" and 170 to 180 pounds) and Dennis’s actual size (5'5" and 125 to 135 pounds). The reliability of the eyewitness identifications is irrelevant to the legal question we must decide— which is whether the Pennsylvania Supreme Court unreasonably applied Brady and its progeny. Nevertheless, a few points about the identifications are worth mentioning. First, the visual conditions were excellent. The murder occurred in the afternoon and the weather was clear. Second, the witnesses saw the shooter at close range and had unobstructed views of his face. Howard was one to two feet away *358 from the shooter and looked him in the face. Bertha and the shooter made eye contact from less than eight feet away, and Bertha was able to observe the expression on the shooter’s face. Cameron saw the face of the shooter from eight to ten feet away. Third, none of the identifications was cross-racial. See Arizona v. Youngblood, 488 U.S. 51, 72 n.8, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (Blackmun, J., dissenting) (noting studies showing that cross-racial identifications are less accurate than same-race identifications). And fourth, witnesses generally overestimate the height and weight of men who are below population averages, as Dennis was. Christian A. Meissner et al., Person Descriptions as Eyewitness Evidence 3, 8, in 2 Handbook of Eyewitness Psychology (Rod C.L. Lindsay et al., eds. 2007) (noting a tendency for witnesses to underestimate the height of taller targets and overestimate the height of shorter targets); Rhona H. Flin & John W. Shepherd, Tall Stories: Eyewitnesses’ Ability to Estimate Height and Weight Characteristics, 5 Human Learning 29, 34 (1986) (noting the same effect for both height and weight); see id. at 36 (citing a study finding that “witnesses tend to overestimate the height of criminals”).
The defense vigorously cross-examined these witnesses and elicited some discrepancies between their testimony and prior statements and between estimates of the shooter’s height and weight and Dennis’s. Nevertheless, the jury found the eyewitnesses’ testimony credible. In addition to that testimony, the prosecution called Charles Thompson, a member of Dennis’s singing group, who testified that he saw Dennis with a small silver handgun several hours after the murder. Whatever one might feel about the testimony of these witnesses or the testimony of eyewitnesses in general, the evidence that convinced the jury to convict Dennis was not, as the district court described it, “scant evidence at best.” Dennis v. Wetzel, 966 F.Supp.2d 489, 491 (E.D. Pa. 2013).
Dennis’s Brady claims concern three documents that he asserts the prosecution should have turned over to him before trial: a receipt from the Department of Public Welfare (DPW), a police activity sheet reporting a conversation with Williams’s aunt and uncle, and police records describing the investigation of a jailhouse tip. The receipt relates to a possible alibi witness, Latanya Cason. Dennis told police that he was riding a bus at the time of the murder — shortly before 2:00 p.m.— and that he saw Cason and waved to her as he left the bus. Cason testified at trial that she saw Dennis at 4:00 or 4:30 p.m., which did not support his alibi. Cason visited the DPW before seeing Dennis that day. Dennis asserts that the police had a time-stamped receipt from Cason’s DPW visit and that, had the receipt been turned over to the defense, Cason would have testified that she saw Dennis at 2:00 or 2:30 p.m. The subject of Dennis’s second claim is a police activity sheet containing detectives’ notes of an interview with Williams’s aunt and uncle, Diane and Man-nasett Pugh. According to the notes, the Pughs told detectives that Zahra Howard told them she recognized the shooter from her high school. This conflicts with Howard’s statements to police and testimony at trial that she had never seen the shooter before. The third Brady claim concerns police records of an investigation of a tip by an inmate, William Frazier, who told police that his friend, Tony Brown, admitted to Frazier that Brown shot Williams. Police never located Tony Brown, and Frazier later admitted that he made up the entire story.
The district court concluded that the prosecution violated Brady by suppressing each of these three items and found that the Pennsylvania Supreme Court’s deter *359 minations to the contrary unreasonably applied clearly established Supreme Court precedent. I disagree with the Majority’s affirmance of the district court and will explain my reasons in detail.
II
The source of my disagreement with the Majority is its failure to apply the deferential standard of review prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA). When a state prisoner applies for a writ of habeas corpus on a claim that was adjudicated on the merits in state court, a federal court may not grant the application unless the state court’s decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). A state court’s application of the law or determination of the facts is not unreasonable merely because it is — in the eyes of the reviewing federal court — wrong. The decision must be “so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.” Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).
We must give state-court decisions “the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). This duty to give state-court decisions deference applies even when a state court does not give a reasoned explanation of its decision. ‘Where a state court’s decision is unaccompanied by an explanation, the habeas petitioner’s burden still must be met by showing there was no reasonable basis for the state court to deny relief.” Richter, 562 U.S. at 98, 131 S.Ct. 770. In such a situation, the reviewing federal court must consider arguments and theories that “could have supported” the decision. Id. at 102, 131 S.Ct. 770.
The AEDPA standard is intentionally difficult to meet. The standard reflects state courts’ competence to resolve federal constitutional questions and states’ strong interest in controlling their criminal justice systems. Federal habeas corpus is designed to “ ‘guard against extreme malfunctions in the state criminal justice systems,’ not [to] substitute for ordinary error correction through appeal.” Id. at 102-03, 131 S.Ct. 770 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring)). Among the courts of appeals, however, there has been some reluctance to adhere to the AEDPA standard as defined by the Supreme Court. In recent terms, the Court has issued a string of reversals, many as summary per curiam opinions, for failure to apply the correct standard of review under AEDPA. See, e.g., Woods v. Etherton, — U.S. -, 136 S.Ct. 1149, 194 L.Ed.2d 333 (2016) (per curiam); Woods v. Donald, — U.S.-, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015) (per curiam); Glebe v. Frost, — U.S. -, 135 S.Ct. 429, 190 L.Ed.2d 317 (2014); Lopez v. Smith, — U.S. -, 135 S.Ct. 1, 190 L.Ed.2d 1 (2014) (per curiam); Marshall v. Rodgers, — U.S.-, 133 S.Ct. 1446, 185 L.Ed.2d 540 (2013) (per curiam); Parker v. Matthews, — U.S. -, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (per curiam); Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). There are many more. I fear that this case may join that list.
The Majority holds that the Pennsylvania Supreme Court unreasonably applied the United States Supreme Court’s decisions in the line of cases discussing prosecutors’ duty to turn over favorable evidence to the defense. In Brady v. Maryland, the Court held that “the sup *360 pression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” 373 U.S. at 87, 83 S.Ct. 1194. The Court later ruled that the duty to disclose exculpatory evidence applies whether a defendant requests it or not. United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court explained that a Bra--dy violation has three components: evidence that is (1) favorable to the defendant, (2) suppressed by the prosecution, and (3) material. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Favorable evidence includes both exculpatory evidence and evidence that could be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence can be suppressed even if it is only known to the police and not to the prosecutor — “the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the ease, including the police.” Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence is material if “there is a reasonable probability that the suppressed evidence would have produced a different verdict.” Strickler, 527 U.S. at 281, 119 S.Ct. 1936. The materiality of suppressed evidence must be assessed cumulatively, “not item by item.” Kyles, 514 U.S. at 436, 115 S.Ct. 1555.
Ill
A
The Pennsylvania Supreme Court addressed the Brady claim based on Latanya Cason’s DPW receipt (and an ineffective assistance of counsel claim based on his counsel’s failure to investigate Cason) without providing much reasoning or detail. The court noted that Cason testified that she saw Dennis at around 4:00 or 4:30 p.m. the day of the murder based on her recollection that she had left work to cash her welfare check at about 2:00 p.m. “During their investigation, however, the police came into possession of a Department of Public Welfare (DPW) receipt showing that Cason cashed her check at 1:03 p.m.” Commonwealth v. Dennis, 552 Pa. 331, 715 A.2d 404, 408 (1998) (“Dennis I”). The court found that the receipt was not material because even if the defense knew of the receipt, Cason’s corrected testimony “would not support [Dennis’s] alibi ... because the murder occurred at 1:50 p.m., forty minutes earlier than Cason’s earliest estimate.” Id. The court concluded: “Finally, it is clear that there clearly was no Brady violation. The DPW receipt was not exculpatory, because it had no bearing on [Dennis’s] alibi, and there is no evidence that the Commonwealth withheld the receipt from the defense.” Id.
I agree with the Majority that the Ca-son receipt was favorable to Dennis and was material, but I disagree with the Majority’s conclusion that the receipt was suppressed. Despite the Pennsylvania Supreme Court’s representations about clarity, it is not clear what the court meant by “there is no evidence that the Commonwealth withheld the receipt from the defense.” The Majority acknowledges that-the Pennsylvania Supreme Court “provided no explanation.” Maj. Op. 288. Yet the Majority assumes that the Pennsylvania Supreme Court made an unreasonable finding of fact or conclusion of law that the prosecution had no duty to disclose the receipt because it was in possession of the police — a finding clearly foreclosed by Kyles, 514 U.S. at 437-38, 115 S.Ct. 1555.
When a state court does not give a reasoned explanation, we are not permitted to assume or guess what the most *361 likely explanation is. “Where a state court’s decision is unaccompanied by an explanation, the habeas petitioner’s burden still must be met by showing there was no reasonable basis for the state court to deny relief.” Richter, 562 U.S. at 98, 181 S.Ct. 770 (emphasis added). In other words, when there is an analytical gap in a state court’s reasoning, we must consider “what arguments or theories ... could have supported ... the state court’s decision.” Id. at 102, 131 S.Ct. 770.
Although the state-court decision at issue in Richter was a summary disposition, the Supreme Court’s instruction to consider arguments that could have supported the state court’s decision is not limited to summary dispositions. In Premo v. Moore, 562 U.S. 115, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011), which was decided the same day as Richter, the Supreme Court considered theories that could have supported a reasoned, written decision with an analytical gap. In state postconviction relief proceedings, Moore argued that his counsel had been unconstitutionally ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The state court rejected his Strickland argument, but, as the Supreme Court noted, the “state court did not specify” whether the ineffectiveness claim failed “because there was no deficient performance under Strickland or because Moore suffered no Strickland prejudice, or both.” Moore, 562 U.S. at 123, 131 S.Ct. 733. In order for a federal court to grant habeas relief, both prongs would need to have involved an unreasonable application of clearly established federal law. Id. The Supreme Court found that the state court “reasonably could have concluded that Moore was not prejudiced by [his] counsel’s actions. Under AEDPA, that finding ends federal review.” Id. at 131, 131 S.Ct. 733.
Because the Pennsylvania Supreme Court provided no explanation for why it found that the receipt was not withheld from the defense, there is an analytical gap. This gap is more open-ended than the two possibilities the state court could have considered in Moore and narrower than a summary disposition, such as Richter, where the universe of possible theories is broad. But our obligation to consider what theories could have supported the Pennsylvania Supreme Court’s decision is no less than in Richter and Moore.
Judge Jordan, in his opinion concurring in part and concurring in the judgment, takes the position that there is no gap to be filled under Richter and Moore. He believes that the only way to explain the Pennsylvania Supreme Court’s statements that the police had the receipt but that the Commonwealth did not withhold the receipt is that the court failed to apply Kyles. Judge Jordan concludes that the Pennsylvania Supreme Court “simply found that there was no evidence that the prosecutor possessed the Cason receipt.” Concurring Op. 351. This is a reasonable explanation, but it is not the only explanation. The Pennsylvania Supreme Court’s opinion lacks sufficient analysis to tell what it meant by “there is no evidence the Commonwealth withheld the receipt from the defense.” Dennis I, 715 A.2d at 408. If we “take the state court’s decision as written,” Concurring Op. 351, rather than assuming that the state court made a mistake, there is an analytical gap.
The Majority also takes the position that the Pennsylvania Supreme Court violated Kyles. The Majority notes, however, that “[t]he Pennsylvania Supreme Court provided no explanation for its ... statement [that there was ‘no evidence that the Commonwealth withheld the receipt from the defense’], and we cannot be sure whether the court was assessing the facts or interpreting the law.” Maj. Op. 288. Despite this lack of clarity, the Majority is evident *362 ly certain that it knows “the precise basis for the state court’s ruling.” Id. at 282. Unlike the Majority, I am unable to discern the precise basis for the state court’s ruling, and, for that reason, this is one of those cases in which consideration of theories that could have supported the state court’s decision is required.
This required consideration leads to the conclusion that there is a viable gap-filling theory here:' the Pennsylvania Supreme Court could have meant that the receipt was not withheld because it was available to the defense with reasonable diligence. The reasonable diligence “branch of the Brady doctrine” is evident, albeit inconsistent, in our own precedents. See United States v. Perdomo, 929 F.2d 967, 973 (3d Cir. 1991) (“Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence.” (emphasis added)); United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (“[T]he government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence,' he can obtain himself.” (quoting United States v. Campagnuolo, 592 F.2d 852, 861 (5th Cir. 1979))). But see Wilson v. Beard, 589 F.3d 651, 664 (3d Cir. 2009) (“[T]he fact that a criminal record is a public document cannot absolve the prosecutor of her responsibility to provide that record to defense counsel.” (internal quotation mark omitted)).
Despite this inconsistency, we reinforced the conclusion that Brady has a reasonable diligence component in Grant v. Lockett, 709 F.3d 224, 231 (3d Cir. 2013). In Grant, the prosecution failed to disclose that its key witness — the only person who testified that Grant was the shooter — was on parole at the time of the shooting. Grant’s post-conviction relief counsel was able to discover that the witness was on parole, and his trial counsel could have looked up the witness’s criminal history in records kept by the clerk of court. We concluded that Grant’s Brady claim “lacked merit” because “trial counsel could have discovered [the witness’s] parole status had he exercised reasonable diligence.” Id. at 230, 231.
The Majority correctly notes that our case law on Brady reasonable diligence “is inconsistent and could easily confüse” and clarifies that 'reasonable diligence “plays no role in the Brady analysis.” Maj. Op. 291. This clarification to our case law is helpful, and were we reviewing this case on direct appeal it would be entirely appropriate. The “no reasonable diligence” rule may indeed represent the best interpretation of the Supreme Court’s Brady case law. But this rule is nonetheless an interpretation of Supreme Court precedent. It does not represent a clearly established holding of the Court, and it does not mean that any other interpretation is unreasonable.
The reasonableness of interpreting Brady to have a reasonable diligence component is supported by the decisions of other courts of appeals. The Majority notes with surprise that “several Courts of Appeals have endorsed some form of a due diligence requirement.” Maj. Op. 291 n.20. “Several” understates the matter. A majority of the courts of appeals have applied a reasonable diligence requirement at one time or another.[1] The number of courts *363 (including our court, ten out of the twelve regional courts of appeals) and decisions applying a reasonable diligence requirement hardly evince a clearly established Supreme Court rule that reasonable diligence plays no role in the Brady analysis. Even if the Majority is correct and all these decisions erroneously applied Brady, it is hard to conclude that the error is “well understood and comprehended in existing law” and “beyond any possibility for fairminded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770. Surely, given the number of federal circuit judges who have concluded that reasonable diligence is a consideration in the analysis of a Brady claim, “it is possible fairminded jurists could disagree” that reasonable diligence is inconsistent with Supreme Court precedent. Id. at 102, 131 S.Ct. 770.
Under the specific facts of this case, the Pennsylvania Supreme Court easily could have concluded that Latanya Cason’s DPW receipt was available to Dennis’s counsel had his counsel exercised reasonable diligence. Dennis was aware of Ca-son — the police only interviewed her after Dennis told them she had seen him. Dennis’s appellate counsel obtained the receipt from the DPW. And Dennis argued that his trial counsel would have located the receipt with “minimal investigation.”[2] (App. 1800.) It was not an unreasonable application of clearly established Supreme *364 Court precedent for the Pennsylvania Supreme Court to conclude that there was no Brady violation where trial counsel could have discovered the evidence by exercising reasonable diligence and investigating his own client’s alibi witness. See United States v. Senn, 129 F.3d 886, 893 (7th Cir. 1997) (“[T]he defendants are hoisted by their own petard: without having obtained the Broward County file they would not have a Brady argument, but the ease with which they obtained their file defeats their claim.”).
The Majority contends the Supreme Court did “away with any belief that Brady imposes a due diligence requirement” in Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Maj. Op. 291. But Banks, which was decided after the Pennsylvania Supreme Court’s decision in Dennis I,[3] is distinguishable. In Banks, the prosecution withheld evidence that one prosecution witness had been “intensively coached” by prosecutors before his testimony and another witness was a paid police informant. 540 U.S. at 677-78, 124 S.Ct. 1256. The prosecution failed to correct these witnesses’ testimony when the witnesses denied talking to anyone about their testimony or receiving payments from police. Id. The Supreme Court refused to adopt a rule allowing the prosecution to “lie and conceal” evidence so long as the prisoner might have been able to detect the “potential existence” of prosecu-torial misconduct. Id. at 696, 124 S.Ct. 1256. Unlike the DPW receipt at issue in the present case, the evidence in Banks of the witness coaching and police payments was solely in the hands of the prosecution. No amount of diligent investigation would have uncovered that evidence. Banks is not directly applicable to evidence that could have been discovered after “minimal investigation.” See Bell v. Bell, 512 F.3d 223, 235 (6th Cir. 2008) (en banc) (concluding that Banks did not call into question precedents applying a reasonable diligence requirement).
Under these circumstances, I cannot conclude that the Pennsylvania Supreme Court’s denial of Dennis’s Brady claim based on the receipt was an unreasonable application of clearly established Supreme Court precedent.
B
The Pennsylvania Supreme Court reasonably determined that the Pugh statement was immaterial under Brady. The statement was found in a police activity sheet that showed that Chedell Williams’s aunt and uncle, Diane and Mannasett Pugh, told police that Zahra Howard told them that she recognized the shooter from school. This alleged statement is contrary to what Howard repeatedly told police and testified about at trial — that she had never seen the shooter before he accosted Williams and her at the SEPTA station.
The postconviction relief court held an evidentiary hearing about this Brady claim. Howard testified that she never told Williams’s family that she had seen the shooter before. When confronted by the purported statement in the police activity sheet, she denied ever having made it. Diane Pugh testified that, as far as she could remember, Howard never said she recognized the shooter before the murder.
The Pennsylvania Supreme Court concluded that the police activity sheet showing the Pugh statement was not material under Brady because there was no reason *365 able probability of a different result had the sheet been turned over. Commonwealth v. Dennis, 609 Pa. 442, 17 A.3d 297, 308-09 (2011) (“Dennis IV’). The Pennsylvania Supreme Court noted that Howard “was extensively cross-examined at trial” about her identification of Dennis, including about whether she had ever seen the shooter before, and she steadfastly testified that Dennis was the shooter and that she had never seen him before. Id. at 309. Two eyewitnesses other than Howard identified Dennis in a photo array, in a line up, and at trial, and these witnesses would not have been affected by any impeachment of Howard. Id. For these reasons, the Pennsylvania Supreme Court held that Dennis “still received a fair trial resulting in a verdict worthy of confidence.” Id. This conclusion was not an unreasonable interpretation of Supreme Court precedent.
The Majority correctly notes that heavy impeachment of a witness does not render further impeachment immaterial. See Banks, 540 U.S. at 702, 124 S.Ct. 1256. In Banks, the prosecution suppressed information that a key witness was a government informant, and the government argued this information was “merely cumulative” because the witness was heavily impeached at trial. Id. None of the testimony at trial concerned the ■witness’s status as an informant, however. The Court concluded this missing information was material because the jury was ignorant of the witness’s “true role” in the case. Id.
The impeachment value of the activity sheet in this case was minor. Howard’s identification of Dennis was cross-examined at trial.' She credibly testified in the postconviction relief hearing that she never made the statements attributed to her in the activity sheet. The activity sheet’s double hearsay makes it inherently weak. This is not the kind of evidence considered material in Banks.
The Majority asserts that had the activity sheet been disclosed, “defense counsel could have impeached Howard'in a manner that very well may have led her to admit she recognized the perpetrators from her high school.” Maj. Op. 301. There is no basis in the record for this speculation, which is undercut by Howard’s consistency in all her sworn testimony at trial and during the postconviction relief hearing. Such a dramatic courtroom reversal is more likely in a Matlock or Perry Mason script than in reality. The unlikely nature of this speculation does not create a reasonable probability of a different result or “undermine confidence in the outcome,” as required for Brady materiality.[4] Bagley, 473 U.S. at 682, 105 S.Ct. 3375.
The Pennsylvania Supreme Court’s consideration of the strength of the other evidence against Dennis was also not unreasonable. The materiality of the activity sheet “must be evaluated in the context of the entire record.” Agurs, 427 U.S. at 112, 96 S.Ct. 2392. And “evidence impeaching an eyewitness may not be material if the State’s other evidence is strong enough to sustain confidence in the verdict.” Smith v. Cain, — U.S. -, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012). The Pennsylvania Supreme Court could reasonably have concluded, in the context of the entire record, that any impeachment value of the activity sheet would not undermine confidence in the verdict. Bertha and Cameron also identified Dennis in a photo array, in a line up, and at trial. Impeachment of Howard *366 would not have affected the weight of their testimony.
The Majority emphasizes the importance of Howard as “the eyewitness with the most significant exposure to the shooter” and minimizes Bertha and Cameron as “located farther away” with “only brief glimpses of the perpetrators” or “paying little attention.” Maj. Op. 301. But in this case, “farther away” was only eight feet from the shooter for Bertha and ten feet from the shooter for Cameron, and each had an unobstructed view of the shooter’s face. To the extent Bertha and Cameron had not been paying attention to the commotion, the gunshot focused their view and spurred them into action. Bertha stepped into the street as the shooter ran past, stopped as the shooter raised his gun, and then followed behind him. Cameron and the shooter made eye contact. When the shooter fled, Cameron ran to aid Williams. The eyewitness testimony of Bertha and Cameron was powerful evidence of guilt.
The Majority criticizes the Pennsylvania Supreme Court for applying a “sufficiency of the evidence” standard in lieu of the appropriate Brady materiality standard. Nowhere, however, did the Pennsylvania Supreme Court articulate the wrong standard. The Pennsylvania Supreme Court recognized that Brady materiality is not a question of sufficiency of evidence in Commonwealth v. Weiss, 604 Pa. 573, 986 A.2d 808 (2009), and it cited Weiss in Dennis IV.[5]
The Majority nevertheless concludes that, even if the Pennsylvania Supreme Court knew the correct standard, it unreasonably applied that standard to the facts of this case. The Majority focuses on the Pennsylvania Supreme Court’s statement that “disclosure of the activity sheet would have had no impact upon [Bertha’s and Cameron’s eyewitness] testimony.” Dennis IV, 17 A.3d at 309. According to the Majority, this is evidence that the Pennsylvania Supreme Court was proceeding down a wrong “analytical path.” Maj. Op. 303. But there is nothing inherently wrong with this analytical path. The United States Supreme Court has, at times, made similar statements.
For instance, in Strickler v. Greene, the prosecution withheld exculpatory materials that would have been “devastating ammunition for impeaching” the prosecution’s key witness, Anne Stoltzfus. 527 U.S. 263, 296,119 S.Ct. 1936,144 L.Ed.2d 286 (1999) (Souter, J., dissenting). At the petitioner’s capital murder trial, Stoltzfus testified “in vivid detail” about the abduction of the murder victim. Id. at 266, 119 S.Ct. 1936 (majority opinion). Stoltzfus was the only disinterested eyewitness who testified. The exculpatory materials were police notes of interviews with Stoltzfus and letters Stoltzfus wrote to the police that cast serious doubt on her testimony. The Court found all the elements of Brady met except for materiality. Although the Court recognized the importance of Stoltzfus’s eyewitness testimony, that was not the only evidence before the jury. Other eyewitnesses placed the petitioner at the shopping mall where the abduction occurred, and “considerable forensic and other physical evidence” linked the petitioner to the crime. Id. at 293, 119 S.Ct. 1936. The Court concluded that “[t]he record provides strong support for the conclusion *367 that petitioner would have been convicted of capital murder and sentenced to death, even if Stoltzfus had been severely impeached.” Id. at 294, 119 S.Ct. 1936. Thus, the .petitioner did not convince the Court that there was “a reasonable probability that the jury would have returned a different verdict if her testimony had been either severely impeached or excluded entirely.” Id. at 296, 119 S.Ct. 1936. The Pennsylvania Supreme Court’s reasoning in this case is not appreciably different from the reasoning in Strickler.
The Majority’s remaining reason for concluding that the Pennsylvania Supreme Court unreasonably applied the facts is that the Majority considered the same facts and reached a different conclusion. This is not a proper basis for granting habeas relief. There is a reasonable possibility that impeachment of Howard might have produced a different result, but the Pennsylvania Supreme Court did not unreasonably apply the facts or law in concluding that Dennis did not establish a reasonable probability of a different result. See id. at 291, 119 S.Ct. 1936. I would not grant habeas relief on this claim.
C
Dennis’s final Brady claim concerns documents about the police investigation of a lead from William Frazier. Frazier, an inmate at the Montgomery County Correctional Facility, contacted police and informed them that he knew who shot Che-dell Williams. He told a story about a three-way call he received in jail with his aunt and a friend named Tony Brown. During the call, Tony Brown admitted that he accidentally shot Williams while robbing her. Tony Brown told Frazier that he was accompanied by his Mend Ricky Walker, who was Frazier’s cousin, and another man, “Skeet,” who drove the car.
Despite Frazier’s being a jailhouse informant who obviously wanted to parlay information for something in return (even if only a day out of jail), the police investigated his tip. They took Frazier on a ride-along to Tony Brown’s house, Ricky Walker’s house, the pawnshop where Tony Brown allegedly sold Williams’s earrings, Skeet’s house, and Frazier’s girlfriend’s house. Police interviewed Frazier’s landlord and Walker. Walker told police that he never heard of anyone named Tony Brown or “Skeet.” He explained that he “can’t stand” Frazier, who racked up $1,000 in charges on a phone calling card Walker had lent to him. Despite this investigation, police found no trace of a Tony Brown. This is not surprising. Frazier later admitted that he concocted the entire story.[6]
The Pennsylvania Supreme Court rejected Dennis’s Brady claim about the Frazier lead documents because the documents were inadmissible hearsay. Commonwealth v. Dennis, 597 Pa. 159, 950 A.2d 945, 968 (2008) (“Dennis IIP). This conclusion is not an unreasonable application of clearly established Supreme Court precedent.
Authority is split about whether inadmissible evidence can be the basis for a Brady violation. Our court, along with the First, Second, Sixth, and Eleventh Circuit Courts of Appeals, has concluded that ad *368 missibility is not a prerequisite for a Brady claim. See, e.g., Johnson v. Folino, 705 F.3d 117, 130 (3d Cir. 2013) (“[IJnadmissi-ble evidence may be material if it could have led to the discovery of admissible evidence.”). The Fourth and Seventh Circuits have concluded otherwise. Jardine v. Dittmann, 658 F.3d 772, 777 (7th Cir. 2011) (“Logically, inadmissible evidence is immaterial under this rule.”); Hoke v. Netherland, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996) (“[TJhese statements may well have been inadmissible at trial ... and therefore, as a matter of law, ‘immaterial’ for Brady purposes.”).
The Majority recognizes the contrary decisions of the Fourth and Seventh Circuits and “respectfully conclude^] that they have erred.” Maj. Op. 311 n.27. But in order to grant habeas relief, the Majority must conclude that these courts did more than err — the decisions must be so clearly wrong that they are objectively unreasonable. Does the Majority really believe that our fair-minded colleagues on the Fourth and Seventh Circuits are that wrong? As the Supreme Court has noted, the courts of appeals’ “diverging approaches to [a] question illustrate the possibility of fair-minded disagreement.” White v. Woodall, -U.S.-, 134 S.Ct. 1697, 1703 n.3, 188 L.Ed.2d 698 (2014). Circuit precedent cannot create or refíne clearly established Supreme Court law, and lower federal courts “may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.” Marshall v. Rodgers, — U.S. -, 133 S.Ct. 1446, 1451, 185 L.Ed.2d 540 (2013) (per curiam). Although “[mjost federal courts have concluded that suppressed evidence may be material for Brady purposes even where it is not admissible,” Maj. Op. 310, that does not transform such a rule into clearly established Supreme Court precedent.
The Majority does not cite any direct holding of the Supreme Court establishing a rule that admissibility is irrelevant under Brady. The Majority instead relies on “the Supreme Court’s repeated consideration of impeachment material in Brady cases.” Maj. Op. 309. The Supreme Court’s consideration of impeachment material does not compel the broad conclusion that admissibility is irrelevant.
Because reasonable judges could — and indeed do — disagree about whether Brady material must be admissible, the Pennsylvania Supreme Court did not unreasonably apply clearly established Supreme Court precedent when it found that the inadmissibility of the Frazier lead documents prevented Dennis’s Brady claim.[7]
IV
The Majority asserts that the Cason receipt, Pugh statement, and Frazier documents “effectively gutted the Commonwealth’s case against Dennis” and that the failure to turn over these documents denied Dennis a fair trial. Maj. Op. 269. Not true. Dennis’s inability to obtain the Cason receipt before trial was, as Dennis himself argued, due to his trial counsel’s failure to conduct even a minimal investigation. The double hearsay Pugh statement was credibly refuted by Howard. Even if Howard were impeached, based on the eyewitness testimony of Bertha and Cameron, there was not a reasonable probability of a jury’s returning a different verdict. Frazier’s story was fabricated. It was not an unreasonable application of clearly established fed *369 eral law to consider the inadmissibility of the Frazier documents. In granting habeas relief for each of these Brady claims, the Majority failed to correctly apply the deferential AEDPA standard. I respectfully dissent.

. First Circuit: United States v. Rodriguez, 162 F.3d 135, 147 (1st Cir. 1998) ("The government has no Brady burden when the necessary facts for impeachment are readily available to a diligent defender....").
Second Circuit: United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ("[E]vidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts *363 permitting him to take advantage of that evidence.” (internal quotation marks and alteration omitted)).
Fourth Circuit: United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine.”).
Fifth Circuit: United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997) (“Brady does not obligate the government to produce for a defendant evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence.” (internal quotation marks and alteration omitted)); United States v. Prior, 546 F.2d 1254, 1259 (5th Cir. 1977) (“[N]umerous cases have ruled that the government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.”).
Sixth Circuit: Matthews v. Ishee, 486 F.3d 883, 891 (6th Cir. 2007) (“Where ... the factual basis for a claim is reasonably available to the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense.” (internal quotation marks omitted)).
Seventh Circuit: Boss v. Pierce, 263 F.3d 734, 740 (7th Cir. 2001) ("Evidence is suppressed for Brady purposes only if ... the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.”).
Eighth Circuit: United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001) (“The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels.”).
Ninth Circuit: Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) ("[W]here the defendant is aware of the essential facts enabling him to take advantage of any, exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense.” (quoting United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978))).
Eleventh Circuit: LeCroy v. Sec'y, Fla. Dep’t of Corr., 421 F.3d 1237, 1268 (11th Cir. 2005) ("To establish that he suffered a Brady violation, the defendant must prove that ... the defendant did not possess the evidence and could not have obtained it with reasonable diligence....”).

. The Majority asserts that the 'DPW receipt was not publicly available because DPW regulations prevent disclosure of information about welfare recipients. Maj. Op. 289-90. Dennis did not argue this point below or raise it on appeal, and, to the extent the DPW privacy regulations applied to the receipt, Dennis’s admission that the receipt was available with minimal investigation makes the regulations irrelevant.

. See Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]he phrase ‘clearly established Federal law, as determined by the Supreme Court of the United States’ ... refers to the holdings, as opposed to the dicta, of this Court’s decisions as of the time of the relevant state-court decision.” (emphasis added)).

. The Majority adopts the district court’s conclusion that the activity sheet would have shown that Howard either lied to the Pughs or lied at trial. Maj. Op. 301. Given Howard’s testimony at trial and the postconviction relief hearings, an alternative conclusion is as least as likely: in a crowded and grieving house immediately after the murder, the Pughs misunderstood or later misreported what Howard said.

. See Weiss, 986 A.2d at 816 (remanding to the postconviction relief court to "consider whether disclosure of the impeachment evidence to competent counsel would have made a different result reasonably probable,” which "will necessarily entail a review of all the evidence presented at trial, not for its sufficiency, but for the potential negative effect disclosure of the alleged impeachment evidence would have had thereon”); id. at 815 (“The United States Supreme Court has made clear that Bagley's materiality standard is not a sufficiency of the evidence test.”).

. The Majority asserts that the Frazier "lead was not fruitless, it was simply not rigorously pursued.” Maj. Op. 307. The police did pursue this lead, however, going so far as to take Frazier out of his jail cell and bring him with them on his tour of Philadelphia. The Majority questions why police did not interview more of the people involved in Frazier's tale. Police can always do more investigative work, but they have limited resources. And simply put, this lead coming from a jailhouse snitch was a dead end. The police should not be faulted for deciding not to waste more time on what Frazier himself admitted was "bullshit.” Response to Pet. Rh’g 17 n.13.

. Because the Pennsylvania Supreme Court could reasonably have determined that the Cason receipt was not suppressed and reasonably determined that the Frazier documents were not subject to Brady, materiality was an issue with only the Pugh statement. Accordingly, there is no need to conduct a cumulative materiality analysis.