**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-9000 & 13-9001
_____

SHAWNFATEE BRIDGES,
                    Appellant in No. 13-9001

v.

SECRETARY OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT OF THE STATE CORRECTIONAL INSTITUTION AT
GRATERFORD; SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW; THE DISTRICT ATTORNEY OF THE COUNTY
OF BERKS; THE ATTORNEY GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA; ERIC J. WEAKNECHT, IN HIS CAPACITY AS SHERIFF OF
BERKS COUNTY PENNSYLVANIA,
                    Appellants in No. 13-9000

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:06-cv-00268)
District Judge: Hon. Anita B. Brody
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
August 29, 2017
_____

Before: McKEE, SHWARTZ, and FUENTES, Circuit Judges.

(Filed: September 1, 2017)

_____

_____

SHWARTZ, Circuit Judge.

The District Court granted in part and denied in part Shawnfatee Bridges's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Bridges v. Beard, 941 F. Supp. 2d 584, 657 (E.D. Pa. 2013). The Secretary of the Pennsylvania Department of Corrections and associated entities ("the Commonwealth") appealed, and Bridges cross-appealed. Because the District Court correctly concluded that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose material impeachment evidence with respect to a key trial witness, we will affirm.[1]

I

A

On December 7, 1996, masked men entered Bridges's home in Reading, Pennsylvania while Bridges was at work and robbed his girlfriend at gunpoint. The following day, Bridges and Richard Morales drove to George Robles's home, where Roderick Johnson was also present. Bridges spoke with Morales, Johnson, and Robles about the robbery and said that he believed Damon and Gregory Banks ("the Bankses") were responsible. Bridges, Morales, and Johnson then planned to take revenge on the Bankses, but Robles declined to participate.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Because we conclude that Bridges's Brady claim is meritorious, we need not address the parties' other arguments.

Bridges, Morales, and Johnson drove Bridges's van to a Kmart, bought shells for a shotgun, and returned to Bridges's house. There, they retrieved a shotgun, loaded it, and wrapped it in a coat. They then drove to the Bankses' house and asked the Bankses whether they wanted to go somewhere to smoke marijuana. The Bankses agreed, but Damon Banks first went upstairs and retrieved a .32 caliber handgun. The five men then left in the van with Johnson sitting in the driver's seat, Bridges sitting in the passenger seat, and Morales and the Bankses sitting in the back. Johnson eventually pulled over to the side of the road, turned around, and began shooting the Bankses. Johnson then stopped shooting, pulled the Bankses from the vehicle, and resumed shooting them. At one point, Bridges picked up a gun and fired it in Johnson's direction. The Bankses were left on the road. Morales and Johnson both fled the scene on foot. Police later found Johnson at a restaurant with a .32 caliber gunshot wound. Meanwhile, Bridges drove the van to a street corner, put gasoline in it, and set it on fire.

The police found the Bankses' bodies and several 9 mm shell casings in the area where their bodies were found. In addition, the police located the remains of Bridges's van and found a shotgun and additional 9 mm shell casings. Multiple 9 mm bullets were also recovered from the Bankses' bodies, and a single .38 caliber bullet was recovered from Damon Banks's body.

The Commonwealth filed an information charging Bridges with: (1) two counts of first degree murder; (2) two counts of third degree murder; (3) four counts of aggravated assault; (4) two counts of conspiracy to commit murder; (5) four counts of conspiracy to

3

commit aggravated assault; (6) possessing instruments of crime; (7) tampering with physical evidence; and (8) hindering apprehension or prosecution.[2]

B

On January 27, 1998, a jury trial commenced in the Court of Common Pleas of Berks County. During the trial, conflicting evidence was presented regarding whether Bridges intended to kill the Bankses or merely intended to harm them. At trial, Robles testified that he had a conversation with Bridges, Morales, and Johnson in which Bridges indicated that he believed the Bankses were responsible for the robbery and that he "was going to take care of them right now." App. 426. According to Robles, the other men invited Robles to come with them, and Robles testified that he asked Bridges

> What, are you going to beat them up? [Bridges] was like, no, they put guns to my girl's head and my baby was there. I got -- I gotta take them out. I'm gonna get them and I'm I'm gonna kill them and I'm going to put an end to this forever. Because if I let them get away with it now they are going to try to do it again so I'm going to have to do what I have to do.

App. 426. Robles further testified that "all three of them were saying we are gonna kill them, we are gonna kill them. We are going to put an end to this." App. 426. Robles stated that Bridges had a black 9 mm Glock handgun with him and that Bridges pulled out the gun while saying that he was "gonna kill them and you know what I mean." App. 427. Robles also indicated that Johnson wanted to kill the Bankses immediately, but Bridges suggested that they wait until dark.

---

[2] The information charged Bridges as Johnson's accomplice on the murder and aggravated assault counts and as a conspirator with Johnson and Morales on the conspiracy counts.

Bridges provided a statement to police, which was read to the jury during the trial, suggesting that the men had agreed only to harm the Bankses, not to kill them. The statement indicated that Bridges, Morales, and Johnson had a conversation in which the men discussed that they would "fuck [the Bankses] up" but did not discuss killing them. App. 1770. Bridges stated that, when Johnson began shooting the Bankses, he yelled at Johnson to stop, picked up a gun, and fired it in Johnson's direction to stop him from shooting. He further stated that, after the shooting, he went to Morales's house and asked Morales why Johnson started shooting, and Morales responded that he did not know but said he thought they "were suppose[d] to fuck [the Bankses] up." App. 1770.

To undermine Robles's testimony, Bridges asked Robles whether he was a paid informant, which Robles denied. Bridges also confronted Robles with the fact that Robles had spoken with police at least a dozen times regarding the shooting and, in particular, spoke frequently with Detective Angel Cabrera of the Reading Police Department, but that Robles did not disclose until immediately before trial that Bridges said he planned to kill the Bankses or that Bridges had a 9 mm handgun. In addition, Bridges introduced a letter that Robles wrote to Cabrera while Robles was in jail on a material witness warrant in which Robles stated that he would do anything to get out of jail, and elicited testimony that Robles was released immediately after he testified against Johnson.

In his closing statement, Bridges noted that Robles had frequently answered questions on cross-examination by saying he did not know or did not remember, emphasized that Robles had spoken with Cabrera on many different occasions and failed

5

to mention until the eve of the trial that Bridges was holding a 9 mm handgun or that Bridges said he planned to kill the Bankses, and drew attention to the letter Robles wrote to Cabrera.

The Commonwealth's closing statement, on the other hand, emphasized Robles's testimony that Bridges said he wanted to kill the Bankses and repeatedly suggested that Robles had no motive to testify against Bridges. The Commonwealth asked the jury "[w]hat is George Robles gaining out of this case?" and indicated that Robles may even have put himself in danger by testifying. App. 508. The Commonwealth further indicated that Robles did not want to testify, stating that "George Robles didn't volunteer to come in here. George Robles didn't want to come in here, but George Robles came to court and told you what he knew about this case." App. 508.

The jury found Bridges guilty on all counts, and Bridges was sentenced to death.

C

The Pennsylvania Supreme Court affirmed Bridges's conviction and sentence on direct appeal, Commonwealth v. Bridges, 757 A.2d 859 (Pa. 2000), abrogated on other grounds by Commonwealth v. Freeman, 827 A.2d 385 (Pa. 2003), and the United States Supreme Court denied his petition for certiorari.

Bridges then filed a petition and amended petition for post-conviction relief pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-46, and requested, among other things, any discovery showing that Robles was a paid informant or a drug dealer and funds to investigate evidence that might undermine Robles's credibility, asserting that, without an investigation, he could not determine

6

whether to plead a <u>Brady</u> claim. The PCRA court denied Bridges's requests for discovery, funds for an investigator, and other post-conviction relief, and the Pennsylvania Supreme Court affirmed, <u>Commonwealth v. Bridges</u>, 886 A.2d 1127, 1130-33 (Pa. 2005).

Bridges filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania, and a motion for discovery, seeking documents related to Robles's interaction with the police and other materials relevant to Robles's motivation to testify. The District Court granted the motion, and the Commonwealth produced several previously undisclosed police reports involving Robles. These police reports (collectively, "suppressed police reports") form the basis of the <u>Brady</u> claim at issue in this appeal. In general, the suppressed police reports detail five incidents, all of which occurred prior to Bridges's trial, in which Robles was questioned in connection with a police investigation or which suggested Robles engaged in criminal activity.

The first incident occurred in February 1996. The police report states that the complainant had a disagreement with Luz Cintron, Robles's girlfriend, and Robles later approached the complainant on the street, pointed a gun at the complainant and his girlfriend, told the complainant not to bother Cintron, and fired a shot into the air. Robles later told Cabrera that he confronted the complainant but did not pull a gun, and he offered to share information about an unrelated murder with Cabrera in confidence. Cabrera advised Robles to stay away from the complainant and the complainant's

7

girlfriend. The police report concludes that "there is enough to make an arrest, but the victims refused to file charges." App. 3018.

The second incident occurred in April 1996 and involved a report that approximately 11 shots were fired into the house Robles was then renting. According to the police reports, police received information that an individual who had fired a gun during the incident placed the gun into a red bag, which also contained cocaine, and dropped the red bag off at a nearby apartment. Police recovered the red bag at the apartment of Amy Sell. Sell identified the person who brought the bag into the apartment as Edwin Ruiz. Ruiz was charged with possession of a controlled substance. The police reports indicate that Ruiz was a juvenile and Robles was his cousin and his guardian. Robles's fingerprints were found on one of the boxes holding drugs within the red bag. When Cabrera spoke with Ruiz's mother and her friend, the friend indicated that she knew Robles was a drug dealer and that Robles was not Ruiz's cousin. When Cabrera spoke with Robles about the shooting, Robles told Cabrera that he did not see anything. However, Robles reported that a safe belonging to him had been stolen from Sell's apartment. Police returned to the apartment, where both Sell and Rafael Menendez, another occupant of the apartment, told police that Robles was a drug dealer. Menendez also revealed that he asked a friend to remove Robles's safe from the apartment because he was afraid of being caught with the safe. He explained that Robles paid him $20 a week to store the safe, which contained crack cocaine, a gun, and a cellular phone. Robles's safe was later found. Robles was not arrested or charged in connection with these events.

8

The third incident occurred in August 1997 and involved a report of shots fired. The police report indicates that Robles was found at the scene carrying a 9 mm handgun, for which he had a permit. Robles denied firing the gun. However, police found shell casings at the scene that matched Robles's gun. Police confiscated the gun, but Robles was not charged or arrested in connection with this incident.

The fourth incident occurred in September 1997 and involved a report of shots fired near Robles's house. The police report indicates that police questioned Robles about the incident, but Robles denied hearing anything. However, the police report indicated that Robles was involved in drug dealing and that the officer had come into contact with Robles other times when there were reports of shots-fired. Robles was not charged or arrested in connection with this incident.

The fifth incident occurred in November 1997 and involved a report of shots fired near Robles's house. The police report indicates that three men informed police that shots had been fired at them from Robles's residence. The police interviewed Cintron, who said that she knew nothing about it. Cabrera then went to a nearby bar and picked up Robles and brought him back to the house. The police found a recently-fired pistol in Robles's house with shells that matched the casings found at the scene. Robles told police that he did not know who fired the gun. The gun was confiscated, but Robles was not charged or arrested in connection with the incident.

After the Commonwealth produced the suppressed police reports, Bridges filed a second PCRA petition, and he successfully moved the District Court to stay his habeas case so that he could pursue that petition. In Bridges's second PCRA petition, Bridges

9

discussed the suppressed police reports in detail, characterizing the reports as impeachment evidence which undermined Robles's credibility and revealed Robles's motivation to tailor his testimony to aid the prosecution. In claiming that the Commonwealth committed prosecutorial misconduct by concealing and destroying evidence in bad faith—in particular, destroying Bridges's torched van—Bridges argued that the Commonwealth violated its <u>Brady</u> obligations by failing to disclose the suppressed police reports which revealed that Robles attempted to avoid prosecution by providing the police with information. However, Bridges erroneously stated that his <u>Brady</u> claim had been previously litigated, even though he had only recently obtained the alleged <u>Brady</u> evidence as a result of the District Court's order. Therefore, Bridges cited <u>Brady</u> to support his bad faith and prosecutorial misconduct claims, but he apparently did not believe he could pursue an independent <u>Brady</u> claim. Nonetheless, in his PCRA petition, oral argument before the court, and post-hearing briefs, Bridges continued to cite to <u>Brady</u> and characterize the suppressed police reports as <u>Brady</u> material. The PCRA court denied the petition, and, on the <u>Brady</u> issue, merely concluded that "[t]he alleged withholding by the Commonwealth of impeaching documents concerning George Robles has already been litigated and we see no need to further discuss it here." App. 157. The Pennsylvania Supreme Court affirmed without explanation. <u>Commonwealth v. Bridges</u>, 12 A.3d 748 (Pa. 2011) (per curiam). Thereafter, Bridges filed a motion to reactivate the federal proceedings, which the District Court granted, and submitted his third amended habeas petition. Among other things, Bridges argued that the Commonwealth violated <u>Brady</u> by failing to disclose the suppressed police reports. On the <u>Brady</u> claim, the

10

District Court ruled that Bridges exhausted the claim in state court, the state court did not render a decision on the merits of that claim, Bridges had established a Brady violation, and he was therefore entitled to a new trial. Bridges, 941 F. Supp. 2d at 598-609. The Commonwealth appeals this ruling.

## II[3]

### A

A habeas petitioner is required by statute to exhaust his state court remedies before pursuing federal habeas relief. 28 U.S.C. § 2254(b)(1). The Commonwealth concedes that Bridges exhausted his Brady claim. See Commonwealth's First-Step Br. 27 ("Bridges raised a claim regarding the alleged Brady evidence in state court in the form of a second PCRA petition.").

Because the District Court did not hold an evidentiary hearing, we exercise plenary review over its Brady decision. Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009). With respect to our standard for reviewing the state court's Brady ruling, the Commonwealth argues that Bridges's Brady claim was adjudicated on the merits in state court and therefore the deferential standard of review of the state court's decision set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), applies. Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim--

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

11

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Where a claim was not adjudicated on the merits in the state court proceedings, AEDPA deference does not apply, and a federal habeas court reviews legal questions and mixed questions of law and fact de novo, but it presumes the state court's factual determinations are correct unless rebutted by clear and convincing evidence. Simmons, 590 F.3d at 231. The District Court concluded that Bridges's Brady claim was not adjudicated on the merits and therefore AEDPA deference did not apply. Bridges, 941 F. Supp. 2d at 601-02. We review de novo the District Court's legal conclusion as to whether AEDPA deference is applicable. Simmons, 590 F.3d at 231.

Here, the Commonwealth states in a conclusory fashion that Bridges raised the Brady issue in his second PCRA petition, and the PCRA court "passed on the merits of the issues raised." Commonwealth's First-Step Br. 27. A review of the PCRA court's opinion on Bridges's second PCRA petition, however, reveals that it did not address Bridges's Brady claim based upon the suppressed police reports. Rather, the PCRA court stated that the claim had "needlessly reared its head in these proceedings" and concluded that "[t]he alleged withholding by the Commonwealth of impeaching documents concerning George Robles has already been litigated and we see no need to further discuss it here." App. 157. Despite the PCRA court's statement that the Brady issue had already been litigated, none of the prior state court opinions addressed the merits of a

12

Brady claim based on the suppressed police reports. While the state courts may have, in some sense, rejected Bridges's Brady claim by refusing to entertain it, an adjudication on the merits entails more than a rejection as a result of "sheer inadvertence." Johnson v. Williams, 568 U.S. 289, 303 (2013). An adjudication on the merits requires the state court to have evaluated the evidence and the parties' substantive arguments and considered "the intrinsic right and wrong of the matter." Id. Because there is no indication that the state courts evaluated the substance of Bridges's Brady claim based upon the suppressed police reports, AEDPA deference is inapplicable. As a result, we review legal questions and mixed questions of law and fact de novo. Simmons, 590 F.3d at 231.

B

Under Brady, the prosecution has a duty to turn over evidence favorable to the accused where the evidence is material to either guilt or punishment, Brady, 373 U.S. at 87, including evidence that would serve to impeach the credibility of a witness, Wilson v. Beard, 589 F.3d 651, 659 (3d Cir. 2009). This rule requires disclosure of information actually known to the prosecution and "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Wilson, 589 F.3d at 659. "A Brady violation occurs if: (1) the evidence at issue is favorable to the accused, because [it is] either exculpatory or impeaching; (2) the prosecution

13

withheld it;[4] and (3) the defendant was prejudiced because the evidence was 'material.'"

Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir. 2011).

The Commonwealth appropriately does not challenge the District Court's rulings on the first and second prongs of the Brady analysis—namely, that the suppressed police reports were favorable to Bridges and were withheld by the prosecution. With respect to the first prong, as the District Court explained, the police reports are impeaching as to Robles and therefore favorable to Bridges. The reports indicate that Robles was associated with numerous shooting incidents in the time period leading up to Bridges's trial and that the police were aware of allegations that Robles was a drug dealer. See, e.g., App. 3196 (the September 1997 shots-fired police report stating that Robles was a drug dealer and that the officer had come into contact with Robles during multiple shots-fired incidents). However, despite many run-ins with police, Robles was never arrested or charged with respect to any of these incidents. These facts arguably suggest that the police looked the other way with respect to Robles's criminal conduct so that they could obtain information from Robles. In short, this evidence could have been used to impeach Robles because it provided a basis to question whether Robles was motivated to testify in favor of the prosecution to ensure that the police did not pursue criminal charges against him.[5] As to the second Brady prong, the Commonwealth stipulated before the PCRA

---

[4] It is irrelevant whether the police reports were suppressed willfully or inadvertently. Wilson, 589 F.3d at 659.

[5] We characterized the suppressed police reports as "substantial impeachment evidence" in Johnson v. Folino, 705 F.3d 117, 132 (3d Cir. 2013), which involved an unrelated murder trial against Johnson, the shooter in this case, where Robles was also the key witness.

14

court that it failed to disclose the suppressed police reports, and the record shows that these reports were produced for the first time in the habeas proceedings before the District Court.

As to materiality, "[e]vidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." Wilson, 589 F.3d at 665. "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 434 (1995) (citation omitted). Put differently, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. "[T]he materiality of withheld evidence must be considered collectively, not item by item." Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 312 (3d Cir. 2016) (en banc) (internal quotation marks omitted) (quoting Kyles, 514 U.S. at 436).

As noted above, the suppressed police reports documenting Robles's many interactions with police collectively provided impeachment evidence suggesting that the police repeatedly turned a blind eye to Robles's criminal activity. The reports of the first incident indicate that Robles threatened two people with a gun. Robles apparently "volunteered" information about an unrelated murder in the wake of this incident, and the complainant coincidentally decided not to press charges despite sufficient evidence to do so. The reports of the second incident reflect that Robles's fingerprints were found on a box containing drugs, that Robles paid someone to hold a safe that purportedly had

15

contained drugs and a gun, and that multiple witnesses identified Robles as a drug dealer. Therefore, these reports indicated that police had evidence of Robles's involvement in selling drugs, yet they took no action against him. Similarly, the third, fourth, and fifth incidents all involved reports of shots fired near Robles's house in which the police interviewed Robles but took no action against him. In two of the incidents, the police had physical evidence in the form of shell casings that connected Robles to the discharge of a firearm. In the report of one of these incidents, Robles was again described as a drug dealer.

If Bridges had been able to confront Robles and perhaps certain police witnesses[6] with evidence of these numerous interactions between Robles and the police in which Robles avoided prosecution, the jury could have reasonably inferred that Robles had a special relationship with the police that motivated him to testify at trial in favor of the Commonwealth. Using the suppressed police reports, Bridges could have cross-examined Robles about his history of providing information to the police when it appeared he was at risk of investigation or prosecution and attempted to show Robles's desire to curry favor with them. In this way, Bridges may have been able to argue that Robles's bias in the police's favor motivated his testimony about Bridges, including the late disclosure of the only direct evidence of Bridges's intent to kill, namely Bridges's statement that he planned to kill the Bankses. See Johnson v. Folino, 705 F.3d 117, 129

---

[6] A number of the incidents detailed in the suppressed police reports were investigated by Detective Cabrera, who had regular contact with Robles in connection with this case. The contents of these reports could have provided material to cross-examine Cabrera about whether Robles acted as an informant or had any sort of agreement with him.

(3d Cir. 2013) (noting that undisclosed evidence may be considered material when it undermines the testimony of a key witness where that testimony otherwise lacks strong corroboration). In short, these reports provided a basis to cross-examine Robles about bias toward the police, and by extension the Commonwealth, which could have undermined his credibility. Because his testimony was central to the first degree murder charge, and a showing of bias may have weakened it, the absence of evidence showing this bias resulted in a verdict that is not "worthy of confidence." Kyles, 514 U.S. at 434.

Furthermore, if Bridges had been able to present evidence of Robles's potential bias, it could have undermined the Commonwealth's closing argument, which repeatedly characterized Robles as a disinterested witness. See App. 508-09 (Commonwealth's closing statement indicating twice that Robles had nothing to gain from testifying, and stating that Robles did not want to testify). Without the suppressed police reports, Bridges lacked several tools to challenge the Commonwealth's depiction of Robles as disinterested and credible, and there is a reasonable probability that the result of the proceeding concerning at least the first degree murder charge could have been different if the reports had not been suppressed.

The Commonwealth's arguments to the contrary are unconvincing. The Commonwealth essentially raises two arguments: (1) the alleged Brady evidence at issue here is not material because it would not have been admissible under Pennsylvania law, which prohibits the impeachment of a witness's credibility with specific instances of uncharged misconduct; and (2) the police reports indicate that Robles was not prosecuted

17

in connection with the incidents due to insufficient evidence to charge or convict him, not because of the possibility of obtaining information from Robles.

Even assuming the police reports would not have been admissible at trial under the Pennsylvania Rules of Evidence, "admissibility of the evidence itself is not dispositive for <u>Brady</u> purposes." <u>Johnson</u>, 705 F.3d at 130. Indeed, the Supreme Court's <u>Brady</u> jurisprudence "focuses on the benefits of disclosure to the defense, not admissibility." <u>Dennis</u>, 834 F.3d at 309. In fact, "inadmissible evidence may be material if it could have led to the discovery of admissible evidence" or "could have been used effectively to impeach or corral witnesses during cross-examination." <u>Johnson</u>, 705 F.3d at 130. Here, the suppressed police reports may have been useful to show Robles's bias. Moreover, the suppressed police reports identified individuals who apparently had information about Robles's criminal conduct and his relationship with the police and thus the reports may have led to the discovery of admissible evidence.[7]

---

[7] In fact, Bridges presented declarations from several witnesses, some of whom were identified in the suppressed police reports, who declared that Robles was a drug dealer and had a close relationship with police. <u>See</u> App. 2817-18 (Declaration of Orlando Alvarado stating that (1) Robles was the leader of a gang, (2) he was a drug dealer, (3) it was well known that Robles and Cabrera were friends, such that "[e]veryone referred to Cabrera as 'Geo's dad,'" (4) Cabrera would come by Robles's house to pick him up and they would be gone for long periods of time, (5) Cabrera helped Robles get a gun permit even though he had a record and would not normally have been allowed to have a gun, (6) Robles and Cabrera had an arrangement in which Robles would say whatever Cabrera wanted in order to make arrests, whether or not it was true, and (7) Robles would testify against anyone to get out of jail); App. 2825 (Declaration of Edwin Ruiz stating that Robles was friendly with police in Reading and was always able to quickly get out of trouble with the police); App. 2826 (Affidavit of Liz Ruiz stating that Robles is a drug dealer and member of a gang; Robles was selling drugs at the time of the murders, the trial, and afterwards; and Robles is friendly with police officers and they look the other way when Robles is involved in the drug trade); App. 2828-29 (Affidavit

18

The Commonwealth's second argument, that Robles was not charged in these incidents due to a lack of evidence, not because of a deal with the police, misses the point. The fact that there was insufficient evidence to charge or convict Robles of any crime is irrelevant. The question is whether these incidents affected Robles's state of mind such that it could have motivated him to testify in favor of the Commonwealth. See Grant v. Lockett, 709 F.3d 224, 234-35 (3d Cir. 2013) ("We are aware of no requirement that a defendant must introduce evidence of favorable treatment in return for testifying before the witness's subjective motivation for bias becomes relevant."); id. at 235 n.5 (explaining that whether or not a prosecutor actually had a particular agreement with a witness in exchange for testimony was "not the point," because "[t]he poison lurks in the bias that can arise from the witness's subjective state of mind, regardless of whether the witness's belief arose from an actual agreement with, or representation of, the prosecutor"). These reports do just that. Accordingly, the Commonwealth has raised no valid arguments to undermine the conclusion that Bridges has established a Brady violation and is entitled to a new trial.[8]

_____

of Carlos Diaz stating that Robles is the leader of a gang called the Night Life Click that deals drugs, that police had come by Robles's house to speak with him and saw drugs inside the home but did not take action, and that Robles had told him that he supplies the police with information and they leave him alone); App. 2830 (Affidavit of Allyn Ammons stating that Robles is the leader of a gang that deals drugs, that Reading police were aware that he was a gang member and a drug dealer, and that Robles provided information to the police and they left him alone); App. 2832 (Affidavit of Jamie Hess stating that Robles is a drug dealer).

[8] Johnson pursued a Brady claim based upon the same suppressed police reports, and the Court of Common Pleas of Berks County held that a Brady violation had occurred and Johnson was entitled to a new trial. The Commonwealth appealed this ruling to the Pennsylvania Supreme Court, which has not ruled as of August 30, 2017.

19

## III

For the foregoing reasons, we will affirm and, because our ruling dissolves the stay of the District Court's order, and to effectuate the intent of the District Court, we will direct that the Commonwealth retry Bridges within 120 days or release him. Moreover, because this ruling vacates the conviction and death sentence, and in accordance with Williams v. Secretary Pennsylvania Department of Corrections, 848 F.3d 549 (3d Cir. 2017), the Commonwealth will be directed to immediately remove Bridges from death row and reassign him to general population or where it deems appropriate.